## RENEGOTIATION BOARD *v.* BANNERCRAFT CLOTHING CO., INC., ᴇᴛ ᴀʟ.

No. 72–822.   Argued October 17, 1973—Decided February 19, 1974

1

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which STEWART, MARSHALL, and POWELL, JJ., joined, *post,* p. 26.

*Harriet S. Shapiro* argued the cause for petitioner. With her on the brief were *Solicitor General Griswold, Assistant Attorney General Wood, Walter H. Fleischer,* and *William D. Appler.*

*Robert L. Ackerly* argued the cause for respondents Bannercraft Clothing Co., Inc., et al. With him on the brief were *James J. Gallagher, Charles A. O'Connor III,* and *David V. Anthony. Burton A. Schwalb* argued the

cause for respondent David B. Lilly Co., Inc. With him on the brief were *Michael Evan Jaffe* and *Marian B. Horn.**

Mr. Justice Blackmun delivered the opinion of the Court.

Three cases, consolidated for hearing in the court below, raise the issue of the effect of the Freedom of Information Act (FOIA), 5 U. S. C. § 552, upon proceedings pending under the Renegotiation Act of 1951, c. 15, 65 Stat. 7, as amended, 50 U. S. C. App. § 1211 *et seq.* In particular, they concern the jurisdiction of a federal district court to enjoin the renegotiation process until an FOIA claim is resolved.

## I

The three respondents, Bannercraft Clothing Company, Inc., Astro Communication Laboratory, a division of Aiken Industries, Inc., and David B. Lilly Co., Inc., successor to Delaware Fastener Corporation, all possessed national defense contracts with a "Department" of the United States, as defined in § 103 (a) of the Renegotiation Act, 50 U. S. C. App. § 1213 (a). These agreements, therefore, under § 102 of that Act, 50 U. S. C. App. § 1212, were subject to renegotiation.

*A. Bannercraft.* In 1966 and 1967, this respondent manufactured uniforms at a plant in Philadelphia. Its fiscal year was the calendar year. Because most of its production was subject to renegotiation, the company, for each of the two years, timely filed with the Renegotiation Board the financial statement required under § 105 (e)(1) of the Act, 50 U. S. C. App. § 1215 (e)(1). Rep-

---

*Briefs of *amici curiae* urging affirmance were filed by *Gerald C. Smetana, Lawrence M. Cohen,* and *Alan Raywid* for Sears, Roebuck & Co., and by *Milton A. Smith, Mr. Smetana, Jerry Kronenberg,* and *Mr. Raywid* for the Chamber of Commerce of the United States.

resentatives of the Eastern Regional Renegotiation Board then reviewed Bannercraft's operations and conferred with its president. On February 20, 1970, the Regional Board, by letter, advised the contractor that it was recommending that Bannercraft in 1967 had realized excessive profits in the amount of $1,400,000, subject to the usual adjustment for state taxes measured by income and for any tax credit to which the contractor was entitled under § 1481 of the Internal Revenue Code of 1954, 26 U. S. C. § 1481.[1]

Bannercraft promptly requested that it be furnished, pursuant to 32 CFR § 1477.3 (1970),[2] with a "written summary of the facts and reasons" upon which the determination was based. It asserted, however, that "it is not possible to state [as the Regulation's proviso required] whether all relevant evidence has been submitted since we have never had in writing the basis upon which you made this determination." The Regional Board replied that because "the statement required by the regulation" was not submitted, "your request for a summary is defective."

Bannercraft's response was that it had "submitted all of the evidence which it believes to be relevant to the

---

[1] Shortly prior thereto, the Regional Board advised the contractor that it had determined its excessive profits for 1966 to be $75,000.

[2] "§ 1477.3 Furnishing of other statements.

"When a Regional Board has made . . . a final recommendation in a Class A case . . . and the contractor is unable to decide whether to enter into an agreement for the refund of excessive profits so determined or recommended, the Regional Board . . . will furnish the contractor a written summary of the facts and reasons upon which such final determination or recommendation is based in order to assist the contractor in determining whether or not it will enter into an agreement: *Provided,* That the contractor requests such a statement within a reasonable time after it has been advised of such final determination or recommendation, and states that it has submitted all the evidence which it believes to be relevant to the renegotiation proceedings."

renegotiation proceedings," but that this was "without prejudice to an opportunity to offer evidence on the issues disclosed by the [Regional Board's] Summary of Facts and Reasons" and that the required statement was "somewhat meaningless when we do not have a written statement of the issue upon which you have made your finding."

On March 16, Bannercraft, pursuant to the FOIA, made a written request of the Renegotiation Board that six categories of documents be produced.[3] No response to this request was forthcoming.

In late April, the Board, by letters, notified Bannercraft of its determinations that the contractor had realized excessive profits in the amount of $75,000 for 1966 (the same figure determined by the Regional Board) and

---

[3] The request was based on the decision, only six days earlier, in *Grumman Aircraft Engineering Corp.* v. *Renegotiation Board,* 138 U. S. App. D. C. 147, 425 F. 2d 578 (1970), that the Renegotiation Board was subject to the FOIA and that certain Board orders and opinions were accessible to the contractor after deletions made in the light of the Act's exemption provisions. See the same case on remand, 325 F. Supp. 1146, aff'd, 157 U. S. App. D. C. 121, 482 F. 2d 710 (1973).

The documents Bannercraft requested were: (1) communications between the Board and other Government agencies with respect to Bannercraft's renegotiable contracts for 1966 and 1967; (2) investigatory or other reports prepared by Board employees "containing facts which are relevant to the Board's determination as to Bannercraft's renegotiable contracts" for the two years; (3) final opinions, and the like, and summaries on which determinations were based for the years 1962 through 1968 for 11 named companies engaged in similar manufacture; (4) facts upon which the Board concluded that Bannercraft's pricing policy in 1966 was unreasonable; (5) identification of those manufacturers with which Bannercraft's production cost was compared, as stated in the summary for 1966, with cross-reference to comparable data as to each of the 11 named manufacturers; and (6) the "procurement information," described in the summary for 1966, that the Board contended indicated that there was a lack of effective price competition.

$1,450,000 for 1967 (an increase of $50,000 over the Regional Board's determination).

Bannercraft then went to court. On May 1, it filed a complaint against the Board in the United States District Court for the District of Columbia, praying that the Board be enjoined from withholding the documents requested and from conducting any further renegotiation proceedings with Bannercraft for 1966 and 1967 until the documents were produced. The Board opposed the application for temporary relief and moved to dismiss. Judge Smith issued a temporary restraining order and, thereafter, a preliminary injunction, each without opinion, and stayed further Board proceedings.

In May, the Board issued a Statement of Facts and Reasons for Bannercraft's years 1966 and 1967. Bannercraft then made a further request for documents related to the factual basis for the Board's conclusions reflected in the Statement. In July, the Board responded. It produced some documents and, with respect to others, claimed exemption under 5 U. S. C. § 552 (b) [4] or asserted that the information sought was not covered by the Act.[5]

---

[4] "§ 552.

.       .       .       .       .

"(b) This section does not apply to matters that are—

.       .       .       .       .

"(3) specifically exempted from disclosure by statute;
"(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
"(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

.       .       .       .       .

"(7) investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency . . . ."

[5] The Board took the position (a) that the Board-agency communications, the investigatory and other reports, and the "procure-

On August 4, the Board moved to dissolve the preliminary injunction. It took the position that its response to Bannercraft's requests fulfilled its obligations under the FOIA. The District Court denied the motion. The Board then appealed.

B. *Astro*. This respondent's factual case is essentially the same as Bannercraft's. The year at issue is the fiscal year ended September 30, 1967. Astro, pursuant to the FOIA, requested production by the Board of five categories of material.[6] At a conference held on May 12, 1970, Astro was advised that the Board had made a tentative determination of excessive profits for the year in the amount of $225,000. In July, the Board denied Astro's FOIA request.

_____

ment information." (to the extent it consisted of written records), being the first, second, and sixth items specified in the request of March 16, were exempt under 5 U. S. C. §§ 552 (b) (3), (4), (5), and (7); (b) that the facts relied upon by the Board in concluding that Bannercraft's pricing policy was unreasonable, that is, the fourth item in the request of March 16, and the identification of manufacturers, the fifth item, were not requests "for records"; and (c) that copies of clearance notices, orders, and renegotiation agreements issued with respect to the 11 companies named in the third item of the March 16 request, and with respect to manufacturers with whom Bannercraft's production cost was compared, as called for by the fifth item, all with identifying details deleted, were supplied therewith. Beyond this, documents requested by Bannercraft were refused.

[6] These were all documents that constituted the Astro renegotiation report for the year; all documents in the file that analyzed "or in any way [bore] upon" Astro's treatment of selling expenses; all file documents that had to do with "Information received," as referred to in a stated communication from the Regional Board to Astro; all file documents that related to the reasons for the Board's order denying Astro's request to file an untimely application for commercial exemption; and all records that had to do with Astro's renegotiation for the year "to the extent that such documents have been generated by and are in the custody of either" the Regional Board or the Board itself.

On August 12, Astro filed its complaint against the Board in the United States District Court for the District of Columbia. It prayed for relief similar to that sought by Bannercraft. Judge Pratt enjoined the Board from continuing renegotiation proceedings with Astro. The court also ordered the Board to allow Astro, within 30 days, to inspect and obtain copies of all documents requested by Astro that the Board had no objection to turning over, and to submit to the court, *in camera,* all documents the Board objected to producing, with a statement of reasons for each objection. The Board appealed.

C. *Lilly.* This respondent's case is similar to the other two. In June 1970, Lilly and its predecessor in interest, Delaware Fastener Corporation, were advised by their renegotiator that he had made determinations of excessive profits for 1967 for Lilly in the amount of $200,000 and for Fastener in the amount of $500,000.[7] On June 29, the two corporations asked the Board to furnish certain categories of information.[8]

No response was immediately forthcoming from the Board. On July 9, Lilly filed its complaint against the Board in the United States District Court for the Dis-

[7] Delaware Fastener Corp. was merged into David B. Lilly Co., Inc., in 1970 after renegotiation proceedings as to each corporation had begun, but before Lilly's suit was instituted.

[8] The corporations requested all communications between the Board and other governmental agencies concerning either corporation; all sections of the Report of Renegotiation prepared by the Regional Board; all analyses used in comparing either of the corporations "with other contractors or subcontractors and reflecting the facts relating to such comparisons"; all written communications between the Board and firms holding renegotiable contracts or subcontracts in any way concerning either of the corporations and their performance; and all intra-agency memoranda and written communications consisting of recommendations or analyses prepared by the Board in connection with the renegotiation proceedings.

trict of Columbia, praying for an order compelling the Board to produce the documents demanded and restraining the Board from acting and, in particular, from requiring the contractors to elect a procedure until the documents had been produced and the contractors had been given a reasonable time to study them. Thereafter, the Board denied the request for information.

On July 31, Judge Jones issued an order temporarily restraining the Board from continuing renegotiation with Lilly and Delaware. Subsequently, the Board moved to dismiss the complaint or, in the alternative, for summary judgment. On September 1, a preliminary injunction was issued. The Board appealed.

The three appeals were consolidated and heard together in the United States Court of Appeals for the District of Columbia Circuit. The Court of Appeals, one judge dissenting, affirmed all three decisions. 151 U. S. App. D. C. 174, 466 F. 2d 345 (1972). It held that the District Court possessed jurisdiction under the FOIA to enjoin administrative proceedings before the Board and to order the production of appropriate documents. It concluded that, "although it is undeniably true that Congress was principally interested in opening administrative processes to the scrutiny of the press and general public" when it enacted the FOIA, "Congress was also troubled by the plight of those forced to litigate with agencies on the basis of secret laws or incomplete information." *Id.,* at 181, 466 F. 2d, at 352. The court then described this latter congressional concern as a "subsidiary statutory purpose," citing excerpts from S. Rep. No. 813, 89th Cong., 1st Sess., 7 (1965), and from H. R. Rep. No. 1497, 89th Cong., 2d Sess., 8 (1966), and also citing 5 U. S. C. § 552 (a)(2). See *infra,* at 12 n. 9. It reasoned that, despite "the fact that the Act nowhere in terms authorizes . . . injunctions" against agency proceedings, in enacting the statute Congress intended to confer broad

equitable jurisdiction upon the district courts, and that "temporary stays of pending administrative procedures may be necessary on occasion to enforce the policy" of the FOIA. 151 U. S. App. D. C., at 181–183, 466 F. 2d, at 352–354.

The court then turned to the exhaustion-of-administrative-remedies question. It observed that there is no general rule that it is always improper for a court to interfere with pending administrative proceedings, citing *McKart* v. *United States,* 395 U. S. 185, 193 (1969). It concluded that "when the purposes of the doctrine are individually measured against the facts of these cases, it is plain that no legitimate judicial policy would be served by depriving these appellees of the relief they seek." 151 U. S. App. D. C., at 184, 466 F. 2d, at 355. In effect, the court reasoned that contractors need exhaust only their administrative remedies under the FOIA, and not their administrative remedies under the Renegotiation Act, as a condition precedent to requesting injunctive relief against renegotiation proceedings. The court found the contractors' remedies before the Board and *de novo* proceedings in the Court of Claims inadequate to prevent irreparable harm.

The dissenting judge began with the accepted proposition that federal courts have only limited jurisdiction and stated that the majority's observation, to the effect that the "existence of present need for judicial intervention does have a bearing on both jurisdiction and exhaustion," is "an error bordering on constitutional dimensions," for the appellees' need "is wholly irrelevant to determination of the jurisdiction of the District Courts in these cases." *Id.,* at 191, 466 F. 2d, at 362.

The dissent then turned to the principle that where a statute creates a right and provides a special remedy, that remedy is exclusive. Thus, in the FOIA, Congress

gave the general public an express right of access to all Federal Government information not within the exempted categories. This right was enforceable by "the specific, narrow, remedies of an injunction against withholding agency records and an affirmative order to produce such records improperly withheld." *Ibid.* The dissent concluded that no jurisdiction to grant any other remedy was conferred by Congress and that the District Court, therefore, was without jurisdiction to enjoin the proceedings before the Renegotiation Board. Nothing in the congressional reports cited by the majority justified its contrary conclusion. The dissent further concluded that there was no suggestion that Congress had any concern with litigants before the administrative agencies, and that what they were concerned with was to make information available "to any member of the public without requiring any showing of need therefor." *Id.*, at 192, 466 F. 2d, at 363.

The dissent also was at odds with the majority's disposition of the exhaustion issue. It asserted that the majority seriously misconstrued the intended functioning of the Renegotiation Board's procedures, namely, that controlled access to information concerning the Government's position plays a significant role in the administrative process; that interruption of the administrative proceedings totally destroys the balance of negotiating strength; and that the attempt to enjoin the ongoing negotiations was really not a request for relief under the FOIA but was a challenge to the Board's procedures themselves. *Id.*, at 194–195, 466 F. 2d, at 365–366.

We granted certiorari, 410 U. S. 907 (1973), because of the importance of the issue of the impact of the FOIA upon long-established procedures of the Renegotiation Board.

## II

Before considering the issue of the District Court's jurisdiction to enjoin a proceeding pending in the Renegotiation Board, it is helpful to review the provisions of the FOIA and of the Renegotiation Act of 1951:

A. *The FOIA.* This statute, 5 U. S. C. § 552, was enacted in 1966, 80 Stat. 383, as a revision of § 3 of the Administrative Procedure Act, 5 U. S. C. § 1002 (1964 ed.). S. Rep. No. 813, 89th Cong., 1st Sess., 3–4 (1965); H. R. Rep. No. 1497, 89th Cong., 2d Sess., 1–6 (1966). It was amended by Pub. L. 90–23, adopted June 5, 1967, 81 Stat. 54.

Section 552 (a) states, "Each agency shall make available to the public" certain information of enumerated categories. This covers virtually all information not specifically exempted by § 552 (b). Section 552 (a)(2) [9] provides the sanction that a "final order, opinion, statement of policy, interpretation, or staff manual or instruc-

---

[9] "§ 552. Public Information; agency rules, opinions, orders, records, and proceedings.

"(a) Each agency shall make available to the public information as follows:

. . . . .

"(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—
"(A) final opinions . . .
"(B) . . . statements of policy and interpretations . . . and
"(C) administrative staff manuals and instructions to staff that affect a member of the public;
". . . A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—
"(i) it has been indexed and either made available or published as provided by this paragraph; or
"(ii) the party has actual and timely notice of the terms thereof."

tion" may not be relied upon as precedent by the agency against a party unless "it has been indexed and either made available or published," or unless a party has "actual and timely notice of the terms thereof." Section 552 (a) (3) specifically vests the District Court with jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." It places the burden on the agency to sustain its action; it empowers the District Court to punish the responsible employee for contempt in the event of noncompliance; and it provides that the FOIA suit generally is to take precedence on the court's docket and is to be expedited on the calendar.[10]

B. *The Renegotiation Act of 1951.*[11] This statute, 50 U. S. C. App. §§ 1211–1233, enacted shortly after the close of World War II and at the height of the Korean conflict, recites that Congress had made available "extensive funds" for the execution of the national defense program and that "sound execution" of the program requires "the elimination of excessive profits from contracts made with the United States, and from related subcontracts." § 101, 50 U. S. C. App. § 1211. The Renegotiation

---

[10] In pertinent part, § 552 (a) (3) provides:

"On complaint, the district court . . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo and the burden is on the agency to sustain its action. In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee . . . . Except as to causes the court considers of greater importance, proceedings before the district court, as authorized by this paragraph, take precedence on the docket over all other causes and shall be assigned for hearing and trial at the earliest practicable date and expedited in every way."

[11] Predecessor renegotiation statutes are cited and described in *Lichter* v. *United States,* 334 U. S. 742, 745 n. 1 (1948).

Board is established as an independent agency in the Executive Branch to accomplish this objective. § 107, 50 U. S. C. App. § 1217 (a). The Board's functions are excluded from the operation of the Administrative Procedure Act (5 U. S. C. § 551 *et seq.*, and § 701 *et seq.*) except the public information section thereof (5 U. S. C. § 552). § 111, 50 U. S. C. App. § 1221.

The Board operates primarily by informal negotiation with the contractor and not by formal hearing. It is directed to "endeavor to make an agreement with the contractor . . . with respect to the elimination of excessive profits." § 105 (a), 50 U. S. C. App. § 1215 (a). The contractor subject to the Act must file, for its fiscal year, a detailed financial statement. § 105 (e)(1), 50 U. S. C. App. § 1215 (e)(1). On the basis of this statement an initial determination of excessive profits is made. From the date of filing of the statement, the Board has one year to commence proceedings [12] and, with stated exceptions, the renegotiation is to be completed within two years following its commencement or "all liabilities of the contractor . . . for excessive profits with respect to which such proceeding was commenced shall thereupon be discharged." [13] § 105 (c), 50 U. S. C. App. § 1215 (c).

If the Board and the contractor do not agree, the Board by order determines the excessive profits. § 105 (a), 50 U. S. C. App. § 1215 (a). At the request of the contractor, the Board shall furnish it "with a statement of such determination, of the facts used as a basis

---

[12] Section 105 (c), 50 U. S. C. App. § 1215 (c), provides that, in the absence of fraud, malfeasance, or willful misrepresentation, all liabilities of the contractor for excessive profits shall be discharged if the "proceeding is not commenced prior to the expiration of one year following the date upon which such statement is so filed."

[13] The respondents in the present litigation have agreed to suspend their limitation periods pending resolution of the FOIA claims. See 151 U. S. App. D. C. 174, 190 n. 12, 466 F. 2d 345, 361 n. 12 (1972).

therefor, and of its reasons for such determination."
*Ibid.* The contractor then may initiate a *de novo* pro-
ceeding in the Court of Claims,[14] which has exclusive
jurisdiction to determine the contractor's excessive
profits. § 108, 50 U. S. C. App. § 1218 (1970 ed., Supp.
II). The action "shall not be treated as a proceeding to
review the determination of the Board," *ibid.,* and the
Board's statement "shall not be used in the Court of
Claims as proof of the facts or conclusions stated therein,"
§ 105 (a), 50 U. S. C. App. § 1215 (a) (1970 ed., Supp. II).

The renegotiation process itself is initiated by notice
to the contractor and by assignment of the contractor's
report to the appropriate Regional Board. 32 CFR
§ 1472.2 (1972).[15] Personnel of the Regional Board
then prepare a "Report of Renegotiation" which includes
a "recommendation with respect to the amount, if any,
of excessive profits for the fiscal year under review."
32 CFR § 1472.3 (d). This is only the first of several
steps within the agency structure. Thereafter the state-
ment is reviewed, successively, by a panel of the
Regional Board, by the Regional Board itself, and finally
by the Renegotiation Board. At each level there is
consultation with the contractor, the preparation of a
report and analysis, and submission to the next higher
level of a recommendation as to excessive profits. 32
CFR §§ 1472.3 (d) and (f)–(i), and §§ 1472.4 (b)–(d).
At each stage, the contractor is entitled to a statement
of the basis for the recommendation. Each level is free
to make new findings and no level is bound by the deter-

---

[14] Until July 1971 the proceeding was to be initiated in the Tax
Court. 65 Stat. 21.

[15] The CFR citations throughout this section of this opinion
are to the 1972 version of Renegotiation Board procedures in effect
at the time of the Court of Appeals' decision. The regulations were
amended substantially in the fall of 1972. See 32 CFR pts.
1400–1599 (1973).

mination of the level below; the recommended settlement may decrease or increase at each level. *Ibid.*

## III

It is clear, we think, that the Renegotiation Board, as an entity, is not exempt from applicable provisions of the FOIA. The Board, of course, is an "independent establishment" in the Executive Branch. § 107 (a) of the Renegotiation Act, 50 U. S. C. App. § 1217 (a). But "agency" is broadly defined to mean "each authority of the Government of the United States," except the Congress, the courts, territorial governments, the government of the District of Columbia, and, with respect to 5 U. S. C. § 552, certain other specifically described entities and functions. 5 U. S. C. § 551 (1). The Renegotiation Board is not among those excepted. Further, the House Committee's discussion of the requirement of § 552 (a)(2), that an agency's concurring and dissenting opinions, as well as final opinions, be made available, discloses that a reason for this provision was that "a recent survey indicated that five agencies— including . . . the Renegotiation Board—do not make public the minority views of their members." H. R. Rep. No. 1497, *supra,* at 8. Thus, despite its unique operational methods, the Board falls within the definition of "agency" in § 551 (1).[16]

So to conclude, however, does not provide automatically the answer to the question whether the FOIA authorizes a district court to enjoin Renegotiation Board

---

[16] The Court of Appeals in the present litigation and other federal decisions have recognized the general applicability of the FOIA to the Renegotiation Board. See *Fisher* v. *Renegotiation Board,* 153 U. S. App. D. C. 398, 473 F. 2d 109 (1972); *Lykes Bros. S. S. Co.* v. *United States,* 198 Ct. Cl. 312, 327, 459 F. 2d 1393, 1401 (1972); *Grumman Aircraft Engineering Corp.* v. *Renegotiation Board,* 138 U. S. App. D. C. 147, 425 F. 2d 578 (1970).

proceedings until the court determines that the contractor is or is not entitled to information it claims under the FOIA.

As to this question, the respondent contractors assert that, although the FOIA does not grant this injunctive power in express terms, the power is to be implied from the court's inherent capacity to provide appropriate equitable relief. The Board, on the other hand, emphasizes that Congress in the Act expressly authorized the court to compel the production of agency records improperly withheld, placed the burden on the agency to sustain its action, and directed precedence on the docket for suits under the Act "over all other causes" and expedition of those suits "in every way." 5 U. S. C. § 552 (a)(3). The Board then contends that these provisions constitute the *exclusive* method for enforcing the disclosure requirements of the Act and that any implication of other injunctive power, at the behest of a litigant before the agency, would be inconsistent with the statutory language.

Clearly, as the Court of Appeals held, 151 U. S. App. D. C., at 181, 466 F. 2d, at 352, the Congress "was principally interested in opening administrative processes to the scrutiny of the press and general public when it passed the Information Act." The Second Circuit has described the Act's "ultimate purpose" as one "to enable the public to have sufficient information in order to be able, through the electoral process, to make intelligent, informed choices with respect to the nature, scope, and procedure of federal governmental activities" (footnote omitted). *Frankel* v. *SEC*, 460 F. 2d 813, 816, cert. denied, 409 U. S. 889 (1972). The Senate Report, too, expressed concern for "an informed electorate." S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965).[17]

---

[17] Among other decisions emphasizing this general public purpose

The FOIA, 5 U. S. C. § 552 (a) (3), explicitly confers jurisdiction [18] to grant injunctive relief of a described type, namely, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." In addition, it provides a specific remedy for noncompliance.

This primary purpose of the FOIA, and this express grant of jurisdiction to enjoin in a specific way, coupled with a limited sanction, might suggest that the Act's provision for compelled production was intended to be the exclusive enforcement method. It has been held that "where a statute creates a right and provides a special remedy, that remedy is exclusive." *United States* v. *Babcock,* 250 U. S. 328, 331 (1919). And "Congress for reasons of its own decided upon the method for the protection of the 'right' which it created. It selected the precise machinery and fashioned the tool which it deemed suited to that end." *Switchmen's Union* v. *NMB,*

---

of the Act are *Ethyl Corp.* v. *EPA,* 478 F. 2d 47, 48 (CA4 1973); *Sterling Drug, Inc.* v. *FTC,* 146 U. S. App. D. C. 237, 242, 450 F. 2d 698, 703 (1971); *Soucie* v. *David,* 145 U. S. App. D. C. 144, 153, 448 F. 2d 1067, 1076 (1971); *LaMorte* v. *Mansfield,* 438 F. 2d 448, 451 (CA2 1971); *Bristol-Myers Co.* v. *FTC,* 138 U. S. App. D. C. 22, 25, 424 F. 2d 935, 938, cert. denied, 400 U. S. 824 (1970).

[18] S. 1666, 88th Cong., 2d Sess., was passed by the Senate on July 28, 1964, 110 Cong. Rec. 17086–17089, and reconsidered and passed again on July 31, 1964, 110 Cong Rec. 17666–17668. There was insufficient time, however, for full consideration by the House. S. 1160, 89th Cong., 1st Sess., then became the FOIA and "is substantially S. 1666." S. Rep. No. 813, 89th Cong., 1st Sess., 4 (1965). There was no change in the remedy provided.

The Senate report which accompanied S. 1666 explains, "The provision for enjoining an agency from further withholding is placed in the statute to make clear that the district courts shall have this power." S. Rep. No. 1219, 88th Cong., 2d Sess., 7 (1964). In discussing the contempt provision, the Report states, "This is another addition which has been made to avoid any possible misunderstanding as to the courts' powers." *Ibid.*

320 U. S. 297, 301 (1943). See *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 458 (1974). One therefore may argue, as the Board has argued here, that this is not a situation where "Congress has utilized . . . the broad equitable jurisdiction that inheres in courts and where the proposed exercise of that jurisdiction is consistent with the statutory language and policy, the legislative background and the public interest." *Porter* v. *Warner Holding Co.,* 328 U. S. 395, 403 (1946).

There is significant authority, however, that points to the opposite conclusion. *Porter* itself, although recognizing the kind of situation to which *Babcock* is applicable, 328 U. S., at 403, upheld broad equitable power in the District Court under a statute authorizing the court to grant injunctive and restraining relief "or other order," and did so, not only because of the presence of the "other order" language, but because of the "traditional equity powers of a court." *Id.,* at 400. Emphasis on broad equity power, even in the face of a silent statute, also appears in *Mitchell* v. *Robert DeMario Jewelry, Inc.,* 361 U. S. 288, 290–291 (1960); *Scripps-Howard Radio, Inc.* v. *FCC,* 316 U. S. 4 (1942); *Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658, 671 n. 22 (1963); see L. Jaffe, Judicial Control of Administrative Action 659 (1965), and is sometimes related to the All Writs Act, 28 U. S. C. § 1651 (a). *FTC* v. *Dean Foods Co.,* 384 U. S. 597, 603–604 (1966).

The broad language of the FOIA, with its obvious emphasis on disclosure and with its exemptions carefully delineated as exceptions; the truism that Congress knows how to deprive a court of broad equitable power when it chooses so to do, *Scripps-Howard, supra,* 316 U. S., at 17; and the fact that the Act, to a definite degree, makes the district courts the enforcement arm of the statute, 5 U. S. C. § 552 (a)(3), persuade us that the *Babcock* and

*Switchmen's Union* principle of a statutorily prescribed special and exclusive remedy is not applicable to FOIA cases. With the express vesting of equitable jurisdiction in the district court by § 552 (a), there is little to suggest, despite the Act's primary purpose, that Congress sought to limit the inherent powers of an equity court.

## IV

We find it unnecessary, however, to decide in these cases, whether, or under what circumstances, it would be proper for the District Court to exercise jurisdiction to enjoin agency action pending the resolution of an asserted FOIA claim. We hold only that in a *renegotiation* case the contractor is obliged to pursue its administrative remedy and, when it fails to do so, may not attain its ends through the route of judicial interference. The nature of the renegotiation process mandates this result, and, were it otherwise, the effect would be that renegotiation, and its aims, would be supplanted and defeated by an FOIA suit.[19]

Before the adoption of the FOIA this Court consistently held that the design of the Renegotiation Act was to have renegotiation proceed expeditiously without interruption for judicial review, and that the Board's proceedings were not to be enjoined prior to the exhaustion of the administrative process. This was the result where the proceedings were challenged on constitutional grounds, *Aircraft & Diesel Equipment Corp.* v. *Hirsch,* 331 U. S. 752 (1947); *Lichter* v. *United States,* 334 U. S. 742, 789–793 (1948), on statutory grounds, *Macauley* v. *Waterman S. S. Corp.,* 327 U. S. 540 (1946), and on procedural grounds, *Lichter,* 334 U. S., at 791. The

---

[19] See Note, 1973 U. Ill. L. F. 180, 191 (1973); Note, 51 Tex. L. Rev. 757, 765 (1973).

Court's emphasis was on the absence of any "lawful function" on the part of the courts "to anticipate the administrative decision with their own," *Aircraft*, 331 U. S., at 767; on the availability of a due process hearing in the post-administrative *de novo* proceeding in the Tax Court, *Macauley*, 327 U. S., at 543, where constitutional as well as nonconstitutional issues could be resolved, *Aircraft*, 331 U. S., at 769 n. 30, citing 89 Cong. Rec. 9930 (1943),[20] and at 771; and on the Act's provisions for expeditious settlement in informal negotiation free "from the tedious burden of litigation." *Id.*, at 770.

In *Aircraft* the Court rejected arguments substantially the same as those advanced by the respondents here, *id.*, at 758 n. 12 (inability to participate effectively because of lack of information upon which the Board had relied, see No. 95, O. T. 1946, Tr. of R., Vol. I, p. 141), and refused to permit renegotiation to be enjoined. "To countenance short-circuiting of the Tax Court proceedings here would be, under all the circumstances but more especially in view of Congress' policy and command with respect to those proceedings, a long overreaching of equity's strong arm." 331 U. S., at 781.

Reflection upon the nature of the Renegotiation Board's process fortifies these conclusions. The character and the entire atmosphere of the process is negotiation—that is, renegotiation—of an existing contract. And negotiation is a bargaining process, with give and

---

[20] "The committee has provided that any contractor aggrieved by a determination of excessive profits under the old law, whether he was cooperative and signed a closing agreement or not, may have a review of that determination in the Tax Court of the United States and in the review have all issues, constitutional and otherwise, decided by the court." (Remarks of Cong. Disney.)

take, and with stress upon and use of the strengths of one's own position and the weaknesses of the position of the other party. It is in a process such as this where the phrase "leading from strength" has been so effectively transferred in practical application from the card table to the world of commerce. It is part of the warp and woof of production. It is pure bargaining—permitted by the statute with respect to contracts already made—the same kind of bargaining that produces the union-employer agreement or the transfer of substantial property from the willing seller to the interested buyer.

We see nothing in the adoption of the FOIA in 1966 that impinges upon the settled law of the *Aircraft-Lichter-Macauley* cases or that warrants an exception to the principle they espouse. Nothing new by way of due process emerged with the FOIA. Nothing therein indicates that Congress wished to change the Renegotiation Act's purposeful design of negotiation without interruption for judicial review. FOIA's stress was on disclosure, to be sure, but it was on disclosure for the public, *EPA* v. *Mink,* 410 U. S. 73, 80 (1973), and not for the negotiating self-interested contractor. *Id.,* at 86; see K. Davis, Administrative Law Treatise § 3A.4, p. 120, § 3A.29, p. 171 (Supp. 1970). And when Congress in 1971 reviewed the Renegotiation Act and substituted the Court of Claims for the Tax Court, no other significant change in the existing process was effected. See S. Rep. No. 92–245 (1971), accompanying H. R. 8311, which became the amending statute, Pub. L. 92–41, 85 Stat. 97.

It is no answer to say, as Bannercraft and Astro urge, that *Aircraft, Lichter,* and *Macauley* relate only to issues on the merits over which Congress had vested jurisdiction in the first instance in the Board and then in the Tax Court. We read those decisions otherwise.

Seeking injunctive relief during the pendency of re-
negotiation encourages delay through resort to prelimi-
nary litigation over an FOIA claim. The delay is not
imaginary or without ultimate consequence. The present
cases provide an example of this, for each has been pend-
ing now for more than three years. The Government is
foreclosed from taking action to recover excessive profits
until the Board's final order is entered; even then, inter-
est does not begin to run until 30 days after the entry
of that order. 50 U. S. C. App. §§ 1215 (b) (1) and (2).
The contractor, by delay, has little to lose and much to
gain.

There is no limitation or denial of the contractor's
normal litigation rights when the renegotiation process
is at end. The contractor may institute its *de novo* pro-
ceeding in the Court of Claims, unfettered by any preju-
dice from the agency proceeding and free from any claim
that the Board's determination is supported by substan-
tial evidence. There the usual rights of discovery are
available.[21] And there the parties are not bound by
a prior determination made at any level of the Renegotia-
tion Board structure. 50 U. S. C. App. § 1218. That
proceeding is the judicial remedy at law provided by the
Renegotiation Act and is adequate protection against
injury. Note, 41 Geo. Wash. L. Rev. 1072, 1084 (1973).
We note that a contractor does not become obligated to
remit excessive profits until termination of the Court of
Claims suit, if it elects that course. The injury suffered,
absent an injunction, is no more than the risk of being

---

[21] The Court of Claims has been described, "by virtue of its role
in the renegotiation process and its general expertise in the field of
government contracts," as being "uniquely qualified to supervise
discovery against the Renegotiation Board." Note, 41 Geo. Wash.
L. Rev. 1072, 1084 (1973).

unsuccessful in the *de novo* bargaining process and the incurrence of the expense incident to renegotiation.[22] Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury. *Myers v. Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 51–52 (1938); L. Jaffe, Judicial Control of Administrative Action 429 (1965). Without a clear showing of irreparable injury, see *Virginia Petroleum Jobbers Assn. v. FPC*, 104 U. S. App. D. C. 106, 111, 259 F. 2d 921, 926 (1958), failure to exhaust administrative remedies serves as a bar to judicial intervention in the agency process. *Myers, supra; Sears, Roebuck & Co. v. NLRB,* 153 U. S. App. D. C. 380, 382, 473 F. 2d 91, 93 (1972).

Interference with the agency proceeding opens the way to the use of the FOIA as a tool of discovery, see *Sears, Roebuck & Co. v. NLRB*, 433 F. 2d 210, 211 (CA6 1970), over and beyond that provided by the regulations issued by the Renegotiation Board for its proceedings. See 32 CFR §§ 1480.1–1480.12 (1972).[23] Discovery for litigation purposes is not an expressly indicated purpose of the Act. Protection for the contractor in the renegotiation process is afforded through the injunctive power specifically bestowed by 5 U. S. C. § 552 (a)(3).

The Renegotiation Act and its predecessors obviously emerged from congressional awareness that, with the vastness of defense expenditure, overcharging and misappropriation of public funds by unscrupulous contractors and those fortuitously placed to perform needed work were almost inevitable. The target of the legis-

---

[22] In this litigation there is no allegation or evidence that the Board was negotiating in bad faith or acting *ultra vires*. We therefore are not now concerned with the situation where allegations or evidence of that kind is present.

[23] Since the institution of these suits, the Board has amended its regulations to expand the discovery available to contractors. See 32 CFR §§ 1470.3, 1472.3 to 1472.6, 1474.3 to 1474.5 (1973).

lation was excessive profit, not the fair and reasonable one. The latter was anticipated and accepted. The line between a reasonable profit and excessive profit is not always easily ascertained or brightly lit. But the ascertainment of excessive profits was a duty vested by the Congress in the Renegotiation Board in the first instance. The Board thus is the fulcrum of a process that enables the Government initially to consult a contractor, to make a contract with it, and then to have the contract subject to modification for excessive profits, whenever they materialize, without violation of the Due Process Clause of the Fifth Amendment. The disgorging of excessive profits is not by way of a tax, but the process is not unlike the imposition of a tax equivalent to the excessive profits. Congress' initial placing of the contractor-initiated final proceeding in the Tax Court is indicative of the relationship.

Of course, there is uncertainty in the renegotiation process. And, of course, that uncertainty is lessened or eliminated if the contractor, like the poker player, is able to ascertain all the cards in the Board's hand. There is risk, also, when the contractor accepts the determination of excessive profits made at any level of the renegotiation process. These risks, however, are the same risks that are inherent in the negotiation and voluntary settlement of any dispute. The one who pays possibly might pay less if he resorts to the factfinder instead of making the settlement. But he might pay more. That is the calculated risk he takes. It is the calculated risk provided for by Congress in the administrative process it prescribed in the Renegotiation Act. It is not a risk ungenerously laid upon the contractor, for it is counterbalanced by the profound interest of the public in the recapture of excessive profits that may flow to the contractor under its government contracts.

We stress, in conclusion, that the merits are not before us. They are yet to be decided by the District Court. Whether any demand made by these contractors is so vague as not to constitute a "request for identifiable records," 5 U. S. C. § 552 (a)(3), or is for material exempt from disclosure under 5 U. S. C. § 552 (b), are questions that remain open for decision on remand.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE STEWART, MR. JUSTICE MARSHALL, and MR. JUSTICE POWELL concur, dissenting.

The Court reverses the Court of Appeals, saying that respondent-contractors had not exhausted their administrative remedies. At issue is whether data in possession of the Renegotiation Board and relevant to the controversy between respondents and that Board should be disclosed to respondents. That raises a question under the Freedom of Information Act. It is, I submit, clear that respondents had exhausted every known way to obtain those data through administrative channels. Nothing remained to be done at that level. The District Court is the enforcement arm of the FOIA. Today's decision, however, says that court cannot act. Hence respondents are without remedy. The end result is to make the FOIA a dead letter in this area. Hence my dissent.

The nature of the so-called administrative law aspects of the problems under the Renegotiation Act is unique. The aim, of course, is the elimination of excessive profits of contractors and subcontractors in the national defense program, 50 U. S. C. App. § 1211. Detailed financial information must be filed with the Re-

negotiation Board, *id.*, § 1215 (e)(1). If on the basis of those data the Board decides to proceed, it refers the case to a Regional Renegotiation Board which determines tentatively the amount of excessive profits, 32 CFR § 1472.3 (e).[1] A conference with the contractor is then arranged. It may agree with the Regional Board's determination or contest it. If the latter, a second conference is held with a panel of the Regional Board which hears the arguments of the contractor and submits its recommendations to the Regional Board which may be for a greater or lesser amount than the original tentative determination, *id.*, §§ 1472.3 (f), (h), (i). Thereupon the Regional Board makes its recommendation, *id.*, § 1472.3 (i). If the contractor is still dissatisfied, it can appeal to the Renegotiation Board itself. In that event the case is assigned to a division of the Board which is not bound by or limited to any finding or determination of the Regional Board, *id.*, § 1472.4 (b). The division studies the case *de novo* and makes a recommendation to the Board which then makes a determination greater than, equal to, or less than any of the prior determinations, *id.*, § 1472.4 (d). Even then the renegotiation process continues, the Board seeking to obtain the contractor's voluntary agreement. Only if that effort fails is a final order determining the amount of excessive profits made, *ibid.*

That is the end of the administrative road; but the contractor still has an appeal to the Court of Claims which may redetermine *de novo* what the excessive profits are, 50 U. S. C. App. § 1218 (1970 ed., Supp. II); and from the Court of Claims certiorari may be sought here, *id.*, § 1218a (1970 ed., Supp. II).

---

[1] The CFR citations throughout this opinion are to the regulations which were in effect in 1970. The regulations were substantially amended in the fall of 1972.

The history of the Act makes plain what can be inferred from the nature of the administrative process just described—that Congress chose negotiation, not confrontation or traditional adjudication, as the desirable route. The Act requires the Board to "endeavor to make an agreement with the contractor or subcontractor with respect to the elimination of excessive profits," *id.*, § 1215 (a). The pressure is on the contractor to settle, as at each successive step in the procedure its liability may be increased. The standards are rather vague and imprecise, §§ 1213 (e)(1)–(6),[2] the regulations stating that "[r]easonable profits will be determined in every case by over-all evaluation of the particular factors present and not by the application of any fixed formula with

---

[2] Section 1213 (e) provides: "In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

"(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

"(2) The net worth, with particular regard to the amount and source of public and private capital employed;

"(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

"(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

"(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

"(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted."

respect to rate of profit, or otherwise," 32 CFR § 1460.8. The vagueness of the standards and the risk of an increase in liability at every level of the administrative process have a powerful coercive influence. Approximately 88% of the Board's cases are ended by voluntary agreement, coercive orders being entered in only 12% of the cases. See Fifteenth Annual Report, Renegotiation Board 13 (1970).

In the three cases involved in this litigation the District Court entered its stay orders before the contractors had run the gantlet of the administrative process in the limited sense that each of them had another opportunity to negotiate a lower settlement with the Board, not counting a *de novo* hearing before the Court of Claims.

The documents which the contractors want are in possession of the Board. These documents, it is said, will reveal the strength or weakness of the Board's case against the contractors and the facts or assumptions on which the Board relies in assessing liability. Without those documents, it is said, any meaningful negotiation, envisioned by the Act, is difficult or impossible. Future *de novo* review is not meaningful, it is said, since the contractors are completely in the dark as to the practical considerations which could end the dispute, if the documents were made available. Disclosure of the documents aids negotiation, which is the aim of the Act, and disclosure is necessary and appropriate to carry out the purposes of the Act.

The Court properly holds that the Renegotiation Board is an "agency" within the meaning of the Freedom of Information Act, 5 U. S. C. § 552 (a). The Court also properly holds that § 552 (a)(3), which grants the district court jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant," makes that court the en-

forcement arm of the FOIA. But it denies relief here on the ground that these contractors are obliged to pursue their "administrative remedy" before going to court for an enforcement order.

The Court relies on *Aircraft & Diesel Equipment Corp.* v. *Hirsch,* 331 U. S. 752, and other decisions of that vintage which established a judicial "hands off" policy in renegotiation cases until the case had reached the Tax Court (now the Court of Claims) stage. But those cases antedated the FOIA. That Act, contrary to what the Court says, had as one of its purposes "discovery for litigation purposes." Congress was concerned not only with the press and the general public when it lifted the veil of secrecy surrounding federal agencies but also with litigants. According to the Senate Report, the new FOIA was designed in part to "prevent a citizen from losing a controversy with an agency because of some obscure and hidden order or opinion which the agency knows about but which has been unavailable to the citizen simply because he had no way in which to discover it," S. Rep. No. 813, 89th Cong., 1st Sess., 7.

The FOIA deals with problems of discovery, to use a lawyer's term, and it does not leave the formulation of precise rules of discovery exclusively to the agencies themselves but, as noted, makes the district court the enforcement arm of the Act.

Exhaustion of administrative remedies has skeins of various colors, *McKart* v. *United States,* 395 U. S. 185, 193–194. Ordinarily courts do not interfere until the agency has completed its action, *id.,* at 194, "or else has clearly exceeded its jurisdiction," *ibid.* The present case does not entail supplanting administrative expertise on the merits. The issues tendered concern only administrative procedure.

The court errs in saying that the contractors did not exhaust their administrative remedies. They strenuously

sought the information mandated by the FOIA and exhausted all administrative procedure for obtaining it. That right to full disclosure, if not granted now, is forever lost. For as these contractors seek relief at a higher tier of the administrative process, the reviewing body will not consider whether the contractors could have negotiated settlements of a lesser amount if they had had access to the documents whose discovery is involved here. As Judge J. Skelly Wright said below:

"[I]t should be apparent here that if the contractors are to be granted relief at all they must have it now before the administrative momentum carries their cases beyond the point where the harm can be undone. If we take Congress' declaration of purpose seriously, then the parties are supposed to *negotiate* over excess profits at the lower administrative levels. The seemingly endless *de novo* reviews were intended to make the negotiating process work, not to provide a substitute for negotiation. If the negotiating process fails to occur, the opportunity is lost forever. To say that compulsory awards imposed by the Board or the Court of Claims at the end of the process provide an adequate remedy is to ignore the difference between an agreement freely arrived at, as preferred by Congress, and a judgment imposed by a court of law." 151 U. S. App. D. C. 174, 186, 466 F. 2d 345, 357.

The proceeding in the Court of Claims proscribes review of the Board. Title 50 U. S. C. App. § 1218 (1970 ed., Supp. II) states:

"A proceeding before the Court of Claims to finally determine the amount, if any, of excessive profits *shall not be treated as a proceeding to review the determination of the Board,* but shall be

treated as a proceeding de novo." (Emphasis added.)

There is no power, as I see it, for the Court of Claims to remand the case to the Board to cure any irregularity in its procedures. If these contractors are to have the remedy of full disclosure, it is now or never.

A procedure that accelerates settlements furthers the policy of the Renegotiation Act. The Board judges the profits of the contractors involved in the present case with the profits of other contractors in determining whether their profits are excessive. The relative prices, costs, and profits of those other companies are germane to the ultimate issue to be resolved. One of these contractors has a low "front office" overhead, as the executive officer is the president who has only a secretary. The rest of the employees are engaged in production. The contractor who has a low "front office" expense is penalized for efficiency, if its profits are reduced to the scale allowed contractors who have a high "front office" expense. The Board in its Regulations under the FOIA makes "available for public inspection and copying summaries of facts and reasons issued by the Board," 32 CFR § 1480.5 (a). But an agency making decisions has no right to make secret the basis of those decisions,[3] if the FOIA is to have any real meaning in the

---

[3] The Board in its Regulations also provides:

"When a Regional Board has made . . . a final recommendation in a Class A case, . . . and the contractor is unable to decide whether to enter into an agreement for the refund of excessive profits so determined or recommended, the Regional Board or the Board, as the case may be, will furnish the contractor a written summary of the facts and reasons upon which such final determination or recommendation is based in order to assist the contractor in determining whether or not it will enter into an agreement: *Provided*, That the contractor requests such a statement within a reasonable time after it has been advised of such final determina-

activities of the Renegotiation Board. If a contractor does not know the reasons why the Board or any of its agencies cuts the profits of a contractor 95%, it has no meaningful criteria to determine whether it should settle with the Board or continue to pursue its remedies up the escalator of the hierarchy. It is as if a court could rule for the plaintiff or for the defendant without ever having to disclose its reasons.

The result of today's decision is to put the citizen in a game of "blind man's buff" with the Renegotiation Board. Enforcement of the policy of full disclosure under the FOIA is no intrusion in the determination of the merits of the controversy before the Board. The expertise of the Board does not relate to the FOIA but only to the Renegotiation Act. The FOIA merely describes some of the procedure to be followed by the Board. *Aircraft* concerned the intrusion of the judiciary into the administrative process by a suit to declare the whole renegotiating procedure unconstitutional prior to any adjudication of the merits of the contractor's claim. Granting the relief asked in that case would have gutted the statutes. Granting the relief here would merely make the rules of discovery, established by Congress, applicable to the Renegotiation Board. Denial of the relief establishes a regime of secrecy when Congress has demanded disclosure and gives the Renegotiation Board a degree of administrative absolution [4] at war with the philosophy of the FOIA.

---

tion or recommendation, *and states that it has submitted all the evidence which it believes to be relevant to the renegotiation proceedings.*" 32 CFR § 1477.3. (Emphasis added.)

[4] The hygienic effect of the Administrative Procedure Act is absent here because the Renegotiation Board is excluded from that Act by reason of 50 U. S. C. App. § 1221, the only exception being found in 5 U. S. C. § 552, at issue in this case.

The trend at the federal level has been the evolution of administrative agencies as principalities of power. The Administrative Procedure Act, 60 Stat. 237, was passed as an antidote to that development. It contained a provision in § 3, 5 U. S. C. § 1002 (1964 ed.), for disclosure of information by the agencies. But it was soon criticized because it was "full of loopholes which allow agencies to deny legitimate information to the public. It has been shown innumerable times that information is often withheld only to cover up embarrassing mistakes or irregularities and justified by such phrases . . . as—'requiring secrecy in the public interest,' 'required for good cause to be held confidential,' and 'properly and directly concerned.' " S. Rep. No. 1219, 88th Cong., 2d Sess., 8. As the House Report stated in support of supplanting § 3 of the Administrative Procedure Act with the FOIA "Government agencies whose mistakes cannot bear public scrutiny have found 'good cause' for secrecy." [5] H. R. Rep. No. 1497, 89th Cong., 2d Sess., 6. As respects the role of the courts the House Report stated:

> "The proceedings are to be de novo so that the court can consider the propriety of the withholding instead of being restricted to judicial sanctioning of agency discretion. The Court will have authority whenever it considers such action equitable and appropriate to enjoin the agency from withholding its records and to order the production of agency records improperly withheld. The burden of proof is placed upon the agency which is the only party able to justify the withholding. A private citizen

---

[5] For an account of the operation of the FOIA between 1967 and 1971 see Archibald, Access to Government Information—The Right Before First Amendment, in The First Amendment and the News Media, Final Report, Annual Warren Conference on Advocacy in the United States, June 8–9, 1973, p. 64.

cannot be asked to prove that an agency has withheld information improperly because he will not know the reasons for the agency action." *Id.,* at 9.

The reluctance of the Court to require this administrative agency to live under the law calls to mind the admonition of Mr. Justice Stone speaking for the Court in *United States* v. *Morgan,* 307 U. S. 183, 191:

"Court and agency are the means adopted to attain the prescribed end, and so far as their duties are defined by the words of the statute, those words should be construed so as to attain that end through coördinated action. Neither body should repeat in this day the mistake made by the courts of law when equity was struggling for recognition as an ameliorating system of justice; neither can rightly be regarded by the other as an alien intruder, to be tolerated if must be, but never to be encouraged or aided by the other in the attainment of the common aim."

I would affirm the judgment below.