**Gladys Anna HOLDEN, Appellant,**

v.

**F. David MATHEWS et al.**

**No. 76–1036.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 25, 1977.

Decided April 19, 1977.

Rehearing Denied June 16, 1977.

Paul J. Tagliabue, Washington, D. C., with whom Matthew F. Medeiros and Ralph J. Temple, Washington, D. C., were on the brief, for appellant.

Daniel A. DeRose, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty. and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellees.

Before Mr. Justice CLARK,* of the Supreme Court of the United States, and MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by Justice CLARK.

Mr. Justice CLARK:

This is the second appeal to this court. *Gladys Anna Holden v. Robert H. Finch, Secretary,* 144 U.S.App.D.C. 310, 446 F.2d 1311 (1971), stemming from appellant's attack on her termination on January 7, 1966, from her one-year probationary position as a Research Assistant in the Equal Educational Opportunities Program, Department of Health, Education and Welfare, Washington, D.C. (EEOP). The termination was based on the ground that she "has not demonstrated that her general character traits and capacity are such as to fit her for satisfactory service." Appellant claimed that her termination was based on political discrimination because of her civil rights activities, particularly with the Congress of Racial Equality (CORE), and was violative of her First Amendment rights.

She submitted her claim to the Civil Service Commission which denied it as untimely. Appellant then filed suit in the United States District Court, and upon an adverse ruling there, appealed to this court. A panel of this court found the record on the appeal consisted "solely of untested affidavits and unexplained unilateral assertions",

Id. at p. 1316, and remanded the case with directions that it be referred back to the Commission for it to inquire "by evidentiary hearing if necessary, into this tangle of assertion and counter-assertion, and to make a fair and rational judgment on the question of whether, as the Government insists, appellant subordinated her public duties to her personal prepossessions, or whether, as appellant alleges, her performance of the one was unimpaired by her indulgence of the other."

On remand and referral back to the Commission, a five-day hearing before a hearing officer was held, eleven witnesses testified and voluminous documentary evidence was received, comprising some 1900 pages. This record was presented to the Commission for review, and through its Appeals Examining Office a summary opinion was filed on February 7, 1973, denying the claim. It concluded that the basic factual question to be decided, as stated in appellant's closing brief, was "whether her termination was grounded on political considerations, specifically the 'expression of her views on civil rights matters, both within and without the government, and her participation in private civil rights activities'." In deciding this question, the opinion closely examined the testimony of the Acting Director of EEOP. The latter testified that he was aware of the appellant's general activity with CORE and that it was one of the reasons that induced him to initially recruit appellant; that her activity in that regard during her employment with EEOP did "not necessarily constitute an undesirable level of civil rights activity" for an employee of his agency and that it was not the basis of appellant's termination; that, on the contrary, she was terminated because of her lack of aptitude and cooperation. The Commission on a careful review of the whole record "found the allegation that Miss Holden's separation was based on political discrimination because of her civil

---

* Mr. Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation pursuant to 28 U.S.C. § 294(a).

rights activities' is not supported by the evidence of record."[1]

Appellant then took her case to the Board of Appeals and Review of the Civil Service Commission. Its opinion, dated May 21, 1973, "after fully considering the appellate record concludes that there is no basis for a finding that appellant was removed for any reasons other than those given in the agency's notice of December 28, 1965". In addition the Board of Appeals and Review noted that appellant's contention of political discrimination was of a First Amendment nature "in that she has alleged that she was terminated not for the reasons given but because of activities, comments and/or other exercises of her Constitutional right to freedom of expression." This contention was found to be without support.

Appellant again filed suit in the district court and sought relief on three grounds: (1) political discrimination in violation of her 5th Amendment rights, as well as under 5 U.S.C. § 7324(c); (2) violations of appellant's First Amendment rights; and (3) a violation of her rights under the Performance Rating Act. 5 U.S.C. §§ 4301–4307. On cross motions for summary judgment, the district court granted the motion of the Commission, and this appeal followed.

The appellant raises only First Amendment issues here, asserting (1) the Commission did not comply with this court's order in the former appeal to make a "fair and rational judgment" with respect to the First Amendment issues raised; and (2) the hearing officer did not render any decision after hearing the evidence, and the Commission rendered its decision without hearing any evidence or giving any reasons or making any findings: and (3) there is no indication that the Commission satisfied First Amendment requirements by balancing the interest of the government with that of the appellant; and, (4) whether the court erred in granting the summary judgment of HEW where appellant's dismissal

was based, at least in part, on her participation in nonpartisan political activities in the exercise of her First Amendment rights; and finally, there was no substantial evidence to support the reasons given by HEW for appellant's termination, its asserted reasons being purely pretexts, based on no findings or evidence that supported the position that appellant's nonpartisan civil rights activities affected any protected interest of the federal government.

■ 1. Appellant points out that Judge McGowan in his opinion for the panel on the previous appeal stated:

There is enough in the record before us to raise a nonfrivolous issue as to a possible entrenchment upon appellant's political rights of speech and association, limited though they may be in some degree by the special character of her employment. *Id.* at 1316.

And the Commission was ordered to:

inquire, by evidentiary hearing if necessary . . . and to make a fair and rational judgment on the question of whether, as the Government insists, appellant subordinated her public duties to her personal prepossessions, or whether, as appellant alleges, her performance of the one was unimpaired by her indulgence of the other. *Id.* at 1316.

And, she contends that implicit in this direction was "a requirement that the Commission make findings and articulate reasons in support of its ultimate conclusion, so that this Court, if necessary, could determine whether the Commission's decision was 'fair and rational' and in accord with applicable law." App. brief, p. 11. In her reply brief, appellant urges us to examine the record and make the appropriate findings.

We believe that the opinions of the Commission are quite sufficient to meet the requirements of the former opinion of this court. The Commission issued two opinions, covering eleven pages, one for the

---

1. The Commission did not pass on whether the reasons for the EEOP's action in terminating appellant were sufficient because her appeal under Section 315.806 of the Civil Service Regulations, as a probationer terminated for unsatisfactory performance is limited solely to a review of the allegation of discrimination.

Commission by the Appeals Examining Office and the other by the Board of Appeals and Review. These opinions might well have included a more detailed statement of reasons, but we find no statutory requirement or constitutional command that requires detailed findings of fact or the articulation of underlying reasons. All Judge McGowan required was that the Commission "make a fair and rational judgment", and this it has done on the question posed by the appellant. As the trial court found: "there exists a rational basis for the administrative decision of the Civil Service Commission that plaintiff's separation was based solely on her failure to perform as a probationary employee and was not due to political discrimination."

It might be argued that the question posed to the Commission by appellant was not the one called for by Judge McGowan in his opinion for this court. However, the Commission could hardly be held accountable for that since appellant urged the political question upon it. However, in order to make it clear beyond question that the requirements of the former opinion are met, we shall accept the appellant's suggestion that we make a plenary review of the record and make our own findings.

■ 2. We conclude from a careful and prolonged study of the entire record (some 1900 pages) that appellant subordinated her public duties [to EEOP] to her personal pre-possessions and that her performance of her duties for EEOP was necessarily impaired by her indulgence of her work for CORE and other groups.

At the outset, we note that appellant was recruited for EEOP because of her prior experience and association with CORE. When she first approached EEOP for a job, she was Chairman of the CORE Housing Committee and inquired at her first interview for a job with EEOP, whether she could continue to participate in local civil rights activities. She was told by Mr. Sullivan, who interviewed her, that HEW recognized the right of employees to participate in such activities with the possible exception of activities involving school desegregation, in which EEOP was engaged.

During her entire tenure at EEOP, appellant spent a large percentage of her time performing chores for CORE. As she put it herself in an affidavit in the record [H.T. Part 4, 1067–1972]:

10. During the months I worked for OEEO I was equally [emphasis supplied] active outside the Office of Education and outside of office hours in challenging lack of opportunity and discrimination in all aspects of life, but particularly in the field of housing.

She testified that she was Chairman of the Housing Committee of CORE and participated in demonstrations and activities in local and other CORE chapters, represented CORE in many community coalitions; filed complaints with the Human Relations Commission [enforcement agency for D.C. Fair Housing Regulations]; followed up on these complaints with the Corporation Counsel's office; demonstrated to secure enforcement of cases before the Real Estate Commission; negotiated cases for CORE; wrote CORE surveys and press releases, doing virtually all of the publicity work for the Housing Committee; prepared testimony for public hearings; wrote two major position papers for the *ad hoc* committee on low income housing and suburban housing; on January 19, 1965 participated in a picket line just prior to inauguration of President Johnson; testified before the District Commissioners in an effort to get the National Training School land for housing and demonstrated to get their vote [this project extended over nine months]; picketed many meetings of the National Capital Planning Commission; "spent many long hours" over the drafting of "the best housing agreement that . . . has ever been negotiated by a civil rights group" with the Calomiris Company; "got very good radio publicity . . . through telephone calls to radio stations and press services; also hand delivered or mailed items to the press; picketed Cafritz Company on a series of Saturdays and Sundays in June, 1965; picketed Corporation Counsel's Office to force it to take action against Cafritz under the

Fair Housing Law; worked on some 75 cases under this law; prepared "flyers" for publicity purposes; protested appointment of Mr. Elmore to the Real Estate Commission by picket line and newspaper releases; made appearances on television and was frequently a spokesman on Housing Committee picket lines, etc.

When questioned by her counsel, appellant described one episode in Early Spring 1965: she had come back [to her office at EEOP] from a picket line that took place during the day, "during working hours and it was my policy to inform people when I would be out of the office . . . And when I got back from the demonstration I was told by several people in the office that it had come to the attention of one of the secretaries who was working in Mr. Seeley's office (the Acting Director) that day that I was out of the office on a demonstration . . . And there were several people that told me that this had happened . . And there was a good bit of discussion about this . . . in the clearing house area" (where her office was located). When asked who participated in the discussion, she testified: "My recollection is that it was Mr. Stalvey (her immediate superior) and Mr. Neubeck and I believe Maxine Childress . . . There was a discussion over a period of time during that day, and there were people coming in to report that they had heard this and had I heard it, that this kind of discussion was going on . . ." Appellant was asked, if "At any time did Mr. Stalvey raise a question as to your participation in private volunteer civil rights activities," she replied, "much of the discussion on that day centered around the question of HEW policy . . . yes. My recollection is that he [Stalvey] was asking me questions about this for the purposes of information to clarify what the policy was." As to whether she took leave for the time she spent on the picket line, she replied to her counsel's interrogation that early in the period of her employment by EEOP, she had been told about taking leave for civil rights purposes "which was that we had available to us sort of coupons, leave slips to fill out, and when we wanted

to take leave that we would prepare these things, giving the hours, or we would fill them in after we got back." Appellant then testified that when she first began working in HEW—before Mr. Stalvey's tenure—"I had raised the question about approval for leave. And I had been told that this was a kind of informal matter . . And my understanding was that as long as it was agreeable for you to be out of the office with the people with whom you immediately worked, it was a very informal procedure." When asked if she always filed leave slips, she testified: "There might be an occasion, I am sure here and there, where, for example, we would have a lunch hour . . . where meetings would go a little bit over a normal lunch hour, and I might stay in the afternoon after work . . . to make up that time."

Despite this mountain of evidence from appellant's own mouth, the record is bare of even a reprimand from her superiors for indulging herself in so much outside activity. Moreover, her explanation on those occasions when she did not fill out leave slips was highly suspect and obviously contrived. Beyond question, as the Commission found, her First Amendment rights were not transgressed. She failed to demonstrate any connection between her dismissal and her free speech activities.

■ 3. We now turn to the ground on which appellant was terminated. The stated reasons were: (1) failure to accept directions without resentment and bad grace; (2) her failure to cooperate with other staff members in gathering information from files assigned to her charge; and (3) her failure to use sound judgment in handling inquiries and proposals assigned to her for staff work.

David Seeley, Acting Director, was appellant's senior supervisor and Bennett O. Stalvey was her immediate supervisor during most of her tenure. Both testified to her unacceptable manner of dealing with staff members and outsiders. Seeley testified that appellant expressed "her volatile disapproval of other people in ways that

were not necessarily relevant to the task at hand, and which would damage the functioning of the program . . ." He said that her expressions—both verbal and facial—showed "a condescending or self-righteous attitude, superior attitude toward other people, kind of expressing vindictiveness or revengeful expression." He said, further, that "it was the manner in which these expressions were carried out." The "crucial aspect" in the termination decision "had to do with the manner in which she expressed her views and her demeanor when she engaged in interchanges with other people." Moreover, Seeley found that her dealings with outsiders as well as staff members were "hostile and bitter", "condescending", "self righteous", "insulting and unpleasant, and unnecessarily vindictive", "extremely intolerant", "irritating . . abusive". He based his opinion on his personal observations and conversations with many people who had direct dealings with appellant.

Seeley cited two instances supporting his conclusions as to appellant. First, an incident occurring between appellant and Herbert Wey, a part-time consultant of EEOP. The latter found appellant to be "insulting and unpleasant." Another incident involved numerous complaints from the staff of a program known as ERIC which had undertaken the project of microfilming school desegregation documents in the clearing house where appellant worked. Controversy arose over the lending policy which appellant handled in an "unpleasant fashion." Appellant places all blame on ERIC employees, which Seeley found to some extent true, but what he found objectionable was the manner or way in which she acted.

Bennett O. Stalvey found appellant evasive, slow and unwilling to accept direction. Appellant defied Stalvey's instructions as to her use of the secretarial pool on matters of higher priority; ignored instructions as to letters which Mr. Seeley was to sign; failed to keep Mr. Stalvey advised as to what she was working on; absented herself from the office without permission or leave; would not adhere to EEOP policies to which she was opposed; often accepted assignments and then would not perform them because she found the assignment obnoxious.

The record, as well as the appendix to the government's brief, includes a written statement submitted by Mr. Stalvey to Mr. Seeley "in the Fall of 1965" (JA 445; Tr. 845–846). Mr. Stalvey advised that he found appellant uncooperative; slow in honoring requests for information and at times never furnishing same; resisting many procedures; disputing need for certain action, was resentful and repeatedly violated directives; manifested resentment and lack of acceptance of many people on the staff; on practically every assignment appellant either disputed the need, or the approach, or if she should handle same at all; evidenced personal animosity toward Mr. Stalvey and Mr. Seeley as well as others in authority.

Mr. Stalvey described a staff meeting where appellant angrily declared that Mr. Seeley "did not know what he was doing and didn't know what he wanted." Her resistance along this line continued despite the warning that she was to follow Seeley's instructions. After this confrontation, appellant never disputed assignments made to her; accepted the same but never completed them; had "lots of absences unaccounted for;" resented inquiries from people who wanted less critical desegregation material, was critical of fellow employees, etc.

Certainly for a probationary employee, the evidence overwhelmingly supported termination. Indeed, appellant makes no effective answer to these charges; never denied same and gave unbelievable explanations as to others.

■ 4. We find the Commission's finding supported by substantial evidence as well as having a rational basis on the record, *Polcover v. Secretary of the Treasury,* 155 U.S.App.D.C. 338, 477 F.2d 1223 (1973). The only requisite to the discharge of a probationary employee is a written notice stating conclusions as to why he is being removed. 5 C.F.R. § 315.804; *Sampson v. Murray,* 415 U.S. 1, 94 S.Ct. 937, 39 L.Ed.2d

166 (1974); *Heaphy v. U. S. Treasury Dept.,* 489 F.2d 735 (2d Cir. 1974). There is no appeal on the merits, procedural protections being designed only to prevent arbitrary and capricious action. Here the appellant has had one full evidentiary hearing, at which she was allowed to present all the evidence she wished, as well as having two appeals through the Commission and the courts.

The judgment of the district court is *Affirmed.*