Wayne STANTON et al., Defendants-Appellants,

v.

Louise BOND et al., Plaintiffs-Appellees.

No. 74-1409.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1974.

Decided Oct. 30, 1974.

Theodore L. Sendak, Atty. Gen., and A. Frank Gleaves, III, Deputy Atty. Gen., Indianapolis, Ind., for defendants-appellants.

Lawrence G. Albrecht, Milwaukee, Wis., Seymour Moskowitz, Gary, Ind., Ivan E. Bodensteiner and Michael Mulder, Law Student, Valparaiso, Ind., for plaintiffs-appellees.

Before SWYGERT, Chief Judge, and FAIRCHILD and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

We are asked to determine whether failure of a state to comply with the requirements of the early and periodic screening, diagnosis and treatment (for persons under 21 years of age) provisions of the Social Security Act justifies injunctive relief.

Plaintiffs, representing the class of persons under age 21 who are eligible for medical benefits under Title XIX of the Social Security Act, brought this action under 42 U.S.C. § 1983, against various Indiana state officials, challenging their failure to implement a mandatory federal health program for needy children.

On March 22, 1974, the district court partially granted plaintiffs' motion for summary judgment and enjoined the state officials from continuing to administer the state program in violation of the statute and regulations, and ordered that a complying program be instituted by July 1, 1974. The defendants have appealed.

## I

In 1965 Congress added Title XIX to the Social Security Act, which created a comprehensive program of medical assistance for the needy (popularly called Medicaid.[1] The medical assistance program is administered by the states [2] with the federal government participating through financial grants to the states.[3] States are not required to operate medical assistance plans, but if they elect to do so they must comply with the requirements of Title XIX.[4]

Title XIX requires [5] that each state plan provide five basic services: inpatient hospital services, outpatient hospital services, laboratory and x-ray services, skilled nursing home services and physicians' services.[6] Originally nine other medical services were optional with the states,[7] and additional optional categories of care have been added by Congress from time to time.

In 1967 Congress amended one of the five mandatory requirements to, in effect, require each participating state to furnish a sixth basic service:[8]

[E]ffective July 1, 1969, such early and periodic screening and diagnosis of individuals who are eligible under the plan and are under the age of 21 to ascertain their physical or mental defects, and such health care, treatment, and other measures to correct or ameliorate defects and chronic conditions discovered thereby, as may be provided in regulations of the Secretary.

The addition of "early and periodic screening and diagnosis" and "treatment" (EPSDT) of persons under the age of 21 was the result of a growing need for child health care among the needy.[9]

Early in 1967, President Johnson recommended to Congress a comprehensive program for American children, one recommendation calling for programs providing early diagnosis and treatment of children with handicaps.[10] The President pointed out that over 3.5 million children who needed medical help and another million crippled children did not receive the needed medical services.[11]

Studies have shown that one out of every three poor children in the United States is so anemic as to require immediate medical attention. Severe malnutrition causes permanent brain damage, stunted physical growth, and increased susceptibility to disease.[12]

Senator Mondale pointed out to the Senate in 1972 that in Mississippi, the first state to aggressively implement EPSDT, "examination of 1,178 youngsters revealed 1,301 'medical abnormalities.'" These included 305 cases of multiple cavities, 241 cases of anemia, 97 cases of faulty vision, 217 cases of enlarged tonsils, and significant numbers of hernia, intestinal parasites and poor hearing cases.[13]

1. 42 U.S.C. §§ 1396–1396g.

2. *Id.* § 1396a.

3. *Id.* § 1396b.

4. *Id.* §§ 1396a, 1396c.

5. *Id.* § 1396a(a)(13).

6. *Id.* § 1396d(a)(1–5).

7. The nine original optional services were (1) medical or remedial care furnished by state licensed practitioners; (2) home health care services; (3) private duty nursing services; (4) clinic services; (5) dental services; (6) physical therapy; (7) prescribed drugs, dentures, prosthetic devices and eyeglasses; (8) other diagnostic, screening, preventive and rehabilitative services; and (9) tubercular and mental institution services for the aged. *Id.* § 1396d(a)(6–14).

8. 42 U.S.C. § 1396d(a)(4)(B). Section 1396d(a)(4) originally provided for mandatory skilled nursing home services but the 1967 amendment designated the existing provisions as clause (A) and added the above quoted provisions as clause (B).

9. Comment, Child Health Care: Unresolved Dilemma of Section 1905(a)(4)(B) of the 1967 Social Security Act Amendments, 59 Geo.L.J. 965 (1971).

10. President Johnson, Welfare of Children, H.R.Doc.No.54, 90th Cong., 1st Sess. (1967).

11. *Id.* at 7.

12. McGovern, Hunger in America, N.Y. Times Encyclopedic Almanac 304 (1970).

13. 118 Cong.Rec. 11106 (1972).

Most childhood handicaps can be prevented or cured or corrected if detected early enough. One-third of the chronically handicapped conditions of children in the United States could be corrected or prevented by preschool care, and continuing care to age eighteen would correct or prevent 60 percent.[14]

Despite the urgency of the need for EPSDT and despite the July 1, 1969 deadline for its proposed effective date as established by Congress, final regulations by the Department of Health, Education and Welfare, implementing Title XIX, were not published in the Federal Register until November 9, 1971,[15] did not become effective until February 7, 1972, and gave the states further leeway by providing that by February 7, 1972 [16]

> [T]he State plan must provide that screening, diagnosis, and such additional treatment will be available to all eligible children under 6 years of age, and must specify the progressive stages by which screening, diagnosis,

and such additional treatment will be available to all eligible individuals under 21 no later than July 1, 1973.

Except for the extreme leniency shown in extending the time for full compliance by the states for four years beyond the congressional date, the HEW regulations are fairly stringent. They commence by providing that "[a] State plan for medical assistance under Title XIX of the Social Security Act *must . . .* [s]pecify that at least the first five items of medical and remedial care and services, set forth in paragraph (b)(1) through (5) of this section, *will be provided* to the categorically needy." [17]

Paragraph (b)(4)(ii), which provides for EPSDT,[18] falls within the mandatory category. Paragraph (a)(3) then states that any plan must provide, with respect to the item of care set forth in paragraph (b)(4)(ii), four areas of coverage.[19]

---

14. White House Conference on Children, Report to the President, 184 (1970). Routine throat screening of children age 5—15 with respiratory illness or unexplained fever could prevent 75 percent of rheumatic fever cases. Suslaw, Vieta and Myenberg, Cost of Rheumatic Fever and Its Prevention, 55 Rep. Pub.Health 429 (1965). Early detection and treatment of lead poisoning, which leads to mental retardation, seizure disorder, kidney diseases and other handicaps, can reduce blood lead to safe levels before permanent handicaps occur. Lin-Fu, Preventing Lead Poisoning in Children, 2 Children Today 2 (1973).

15. 36 Fed.Reg. 21409 (1971).

16. 45 C.F.R. § 249.10(a)(3)(iv) (1972).

17. *Id.* § 249.10(a)(1) (emphasis added).

18. *Id.* § 249.10(b)(4)(ii) provides:
*Early and periodic screening and diagnosis of individuals under 21 years of age, and treatment of conditions found.* Early and periodic screening and diagnosis of individuals under the age of 21 who are eligible under the plan to ascertain their physical or mental defects, and health care, treatment, and other measures to correct or ameliorate defects and chronic conditions discovered thereby. Federal financial participation is available for any item of medical or remedial care and serv-

ices included under this section for individuals under the age of 21. Such care and services may be provided under the plan to individuals under the age of 21, even if such care and services are not provided, or are provided in lesser amount, duration or scope to individuals 21 years of age or older.

19. *Id.* § 249.10(a)(3) provides:
(i) For establishment of administrative mechanisms to identify available screening and diagnostic facilities, to assure that individuals under 21 years of age who are eligible for medical assistance may receive the services of such facilities, and to make available such services as may be included under the State plan;

(ii) For identification of those eligible individuals who are in need of medical or remedial care and services furnished through title V grantees, and for assuring that such individuals are informed of such services and are referred to title V grantees for care and services, as appropriate;

(iii) For agreements to assure maximum utilization of existing screening, diagnostic, and treatment services provided by other public and voluntary agencies such as child health clinics, OEO Neighborhood Health Centers, day care centers, nursery schools, school health programs, family planning

The regulations seek "to assure that individuals under 21 years of age who are eligible for medical assistance may receive the services of such facilities . . . ." [20] and "assuring that such individuals are informed of such services. . . ." [21] States are required to enter into "agreements to assure maximum utilization of existing screening, diagnostic, and treatment services provided by other public and voluntary agencies. . . ." [22] State plans are to assure that the necessary services "will be available to all eligible individuals under 21 years of age. . . ." [23]

The final regulation guidelines for the EPSDT program were issued by HEW on June 28, 1973, as part of the Medical Assistance Manual, Part 5, Sections 5–70–00 et seq. (MSA–PRG–21). The guidelines begin with the following introduction:

> The 1967 amendments to title XIX of the Social Security Act added a requirement to Medicaid that was intended to direct attention to the importance of preventive health services and early detection and treatment of disease in children eligible for medical assistance. This corresponded to a similar amendment to title V of the Act. Through this amendment *Congress intended to require States to take aggressive steps* to screen, diagnose and treat children with health problems. Congress was concerned about the variations from State to State in the rates of children treated for handicapping conditions and health problems that could lead to chronic illness and disability. Senate and House Committee reports emphasized the need for extending outreach efforts to create awareness of existing health care services, to stimulate the use of these services, and to make services available so that young people can receive medical care before health problems become chronic and irreversible damage occurs.

MSA–PRG–21, § 5–70–20(A) (emphasis added).

There follows comprehensive descriptions of what is required in the nature of case finding, screening, diagnosis and treatment. The guidelines include the following:

> The State agency must have an outreach program to inform AFDC families and other eligible individuals about the screening program and to encourage them to take advantage of this service.
>
> \*      \*      \*      \*      \*      \*
>
> The State agency must seek out and develop agreements with facilities and practitioners throughout the State that can provide screening and diagnostic services for early casefinding purposes.
>
> \*      \*      \*      \*      \*      \*
>
> To actively seek out eligible individuals for the EPSDT program, the State

---

clinics, maternity clinics, and similar facilities;

(iv) That early and periodic screening and diagnosis to ascertain physical and mental defects, and treatment of conditions discovered within the limits of the State plan on the amount, duration, and scope of care and services, will be available to all eligible individuals under 21 years of age; and that, in addition, eyeglasses, hearing aids, and other kinds of treatment for visual and hearing defects, and at least such dental care as is necessary for relief of pain and infection and for restoration of teeth and maintenance of dental health, will be available, whether or not otherwise included under the State plan, subject, however, to such utilization controls as may be imposed by the State

agency. If such screening, diagnosis, and such additional treatment are not available by the effective date of these regulations to all eligible individuals under 21 years of age, the State plan must provide that screening, diagnosis, and such additional treatment will be available to all eligible children under 6 years of age, and must specify the progressive stages by which screening, diagnosis, and such additional treatment will be available to all eligible individuals under 21 no later than July 1, 1973.

20. *Id.* § 249.10(a)(3)(i).

21. *Id.* § 249.10(a)(3)(ii).

22. *Id.* § 249.10(a)(3)(iii).

23. *Id.* § 249.10(a)(3)(iv).

agency should develop procedures: (a) to inform parents that these services are available for their children, and when and where they are provided; (b) to make sure that they understand the nature and purpose of the screening program; (c) to enlist the help of other community agencies in casefinding activities; and (d) to assure that families are helped, if they need such assistance, to obtain transportation to the screening center and for diagnostic studies and treatment.

*Id.* §§ 5–70–20(B)(6), (B)(7), (D)(1).

Congress, as part of the Social Security Amendments of 1972, enacted a penalty for failure to provide child health screening services under Medicaid:[24]

Notwithstanding any other provision of this section, the amount payable to any State under this part for quarters in a fiscal year shall with respect to quarters in fiscal years beginning after June 30, 1974, be reduced by 1 per centum . . . of such amount if such State fails to—

(1) *inform* all families in the State receiving aid to families with dependent children under the plan of the State approved under this part of the availability of child health screening services under the plan of such State approved under subchapter XIX of this chapter,

(2) provide or arrange for the provision of such screening services in all cases where they are requested, or

(3) arrange for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services.

## II

The mandatory obligation upon each participating state to aggressively notify, seek out and screen persons under 21 in order to detect health problems and to pursue those problems with the need-

ed treatment is made unambiguously clear by the 1967 act and by the interpretative regulations and guidelines.

Indiana is a participating state. On May 17, 1973, defendant Wayne A. Stanton, administrator of the Indiana Department of Public Welfare, issued that department's General Administrative DPW Bulletin No. 70, in which he advised all of the state's 92 county departments of public welfare:

An approved plan for . . . early and periodic screening, diagnosis and treatment of those persons under age 21 was to have been in effect as of February, 1972. Indiana did not meet that deadline. However it is now mandatory that immediate steps be taken to implement this Federal law in order to satisfy the question of compliance that has been repeatedly raised by the Department of Health, Education and Welfare regarding this matter . . . .

The implementation will be gradual. Eight County Departments will begin operation of the plan during *May, 1973.* The remaining County Departments will move into the process on a planned basis until the program is in effect in all 92 County Departments by around *January 1, 1974.* [Emphasis in original.]

Subsequently, letters were sent to Medicaid recipients which advised that caseworkers would visit the recipient and that "the caseworkers will want to know if you feel that your children have any health problems." Medicaid providers were advised that caseworkers would give each recipient a form "with instructions to contact their choice of appropriate Medicaid providers, should a health problem be reported by the recipient, observed by the caseworker, or should the recipient request any type of medical service . . . ."

In defendants' reply brief, they summarize the nature of Indiana's compliance with EPSDT:

Any of the eligible children in this state can secure all of the requested

24. 42 U.S.C. § 603(g) (effective October 20, 1972).

services merely by requesting them from their local health provider . . . . [Recipients] need merely take their children to the health providers of their choice and obtain for their children the required services.

On March 22, 1974, the district court in its memorandum opinion granting in part plaintiffs' motion for summary judgment, found:

A careful reading of the original and supplemental materials filed in this case indicates, in a clear and convincing fashion, that little, if any, headway has been made by the State as far as the implementation of the EPSDT program is concerned. From the information supplied by the Lake County Welfare Department as well as that supplied by the state, it appears to a certainty that the welfare procedures are nearly the same as they were last year. No special training is required for the caseworkers and there have been only minimal attempts to communicate this program to either the caseworkers or to the ultimate recipients. A few letters and directives, clothed in bureaucratic prose, have been issued to the local units of the Department of Public Welfare of Indiana. In fact, there is no evidence of a comprehensive EPSDT program, nor even any semblance of any screening program however minimal.

The court enjoined defendants "from continuing to administer EPSDT in violation of 42 U.S.C. Section 1396d (a)(4)(B) and the regulations established thereunder" and ordered defendants to have a program meeting the minimum standards of, and in substantial compliance with, the regulations and guidelines, "in effect in every county in Indiana by July 1, 1974."

There is no genuine issue as to any material fact and the plaintiffs were entitled to judgment as a matter of law.

Indiana's somewhat casual approach to EPSDT hardly conforms to the aggressive search for early detection of child health problems envisaged by Congress. It is difficult enough to activate the average affluent adult to seek medical assistance until he is virtually laid low. It is utterly beyond belief to expect that children of needy parents will volunteer themselves or that their parents will voluntarily deliver them to the providers of health services for early medical screening and diagnosis. By the time an Indiana child is brought for treatment it may too often be on a stretcher. This is hardly the goal of "early and periodic screening and diagnosis." EPSDT programs must be brought to the recipients; the recipients will not ordinarily go to the programs until it is too late to accomplish the congressional purpose.

III

Defendants have argued that even if Indiana's EPSDT program is not in compliance with federal requirements, the sole remedy is reduction of federal payments to the state in accordance with 42 U.S.C. § 603(g) "with respect to quarters in fiscal years beginning after June 30, 1974."

Declaratory and injunctive relief at the behest of "those individuals most directly affected by the administration of [a] program" are available "should the State not develop a conforming plan within a reasonable period of time" when using federal funds. Rosado v. Wyman, 397 U.S. 397, 420–421, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). *See also* King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Congress knows how to deprive a court of broad equitable power when it chooses to do so. Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 19, 94 S. Ct. 1028, 39 L.Ed.2d 123 (1974). It did not choose to do so in this instance.[25]

Judgment is affirmed.

---

25. Plaintiffs claim federal question jurisdiction under 28 U.S.C. § 1331 and aver that the value of the program of which they are deprived exceeds $10,000 to each plaintiff.

Clearly, to any child with a serious undetected impairment EPSDT may well be of the value claimed, and defendants have made no contest on the point.