Stephanie MITCHELL, et al., on behalf of themselves and all others similarly situated, Plaintiffs-Appellees,

v.

Marlin W. JOHNSTON, in his official capacity as Acting Commissioner of the Texas Department of Human Resources, et al., Defendants-Appellants.

Stephanie MITCHELL, et al., on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,

and

Eddie Mae Benson, Intervenor-Appellant,

v.

Marlin W. JOHNSTON, in his official capacity as Acting Commissioner of the Texas Department of Human Resources, et al., Defendants-Appellants.

Nos. 82–1245, 82–1363.

United States Court of Appeals, Fifth Circuit.

March 14, 1983.

Mark White, Atty. Gen., Ann Clarke Snell, Asst. Atty. Gen., Austin, Tex., for Marlin W. Johnston, et al.

Barbara Hines, Regina L. Rogoff, Austin, Tex., Nancy Elizabeth Ebb, Sara Rosenbaum, Children's Defense Fund, Carol Golubock, Washington, D.C., for Stephanie Mitchell, et al.

Before JOHNSON, WILLIAMS and JOLLY, Circuit Judges.

JOHNSON, Circuit Judge:

The Social Security Act allows states to voluntarily participate in Medicaid programs that provide federal funding for participating states. In exchange for the federal funds, participating states are required to provide certain minimum mandatory services, one of which is entitled Early and Periodic Screening, Diagnosis and Treatment (EPSDT), a service that provides dental care to the children of qualified Medicaid recipients.

Texas, like most states, has taken a bite out of the carrot of cooperative federalism and is, accordingly, subject to the federal stick—the minimum mandatory requirements set forth in the Medicaid legislation. 42 U.S.C. § 1396a, et seq. (1974 & Supp. 1982). Whether the Texas EPSDT program adequately fulfills that state's commitments under the federal-state program is the issue before this Court. The district court concluded that the Texas EPSDT program fails to provide eligible children with the quality preventive dental care envisioned and required by applicable federal law and we

agree. However, since the district court erred by conditioning two Children's Defense Fund (CDF) attorneys' *pro hac vice* admission to the instant case upon a relinquishment of their claim for statutorily authorized attorneys' fees, we affirm in part and reverse and remand in part.

I. *The EPSDT Program and the 1979 Cutback*

For several years, Texas has operated an EPSDT program in cooperation with the federal government. Prior to 1979, EPSDT-eligible children could obtain annual dental checkups. At these checkups, the child's teeth were examined by the treating dentist—visually and/or through use of X-ray equipment. The EPSDT child could receive a fluoride treatment and the dentist was authorized to select any of several dental services should the particular circumstances of the child's dental condition warrant use of such services. These available dental services included: (1) topical fluoride; [1] (2) posterior root canals; [2] (3) fixed space maintainers; [3] (4) partial dental appliances on the posterior teeth; [4] (5) porcelain crowns; [5] (6) antibiotic injections; (7) frenulectomies; [6] and (8) nonsymptomatic extraction of impacted teeth.

In 1979, the Texas Legislature cut the amount of funds the State of Texas would invest in the EPSDT program by forty-five percent. The Texas Department of Human Resources (TDHR) was responsible for allocating the reduced funds and significant cutbacks in available EPSDT services naturally followed. TDHR lengthened the period of time between preventive dental checkups from one year to three years. During this three-year period, the EPSDT child could receive dental services only if the particular dental condition fell within one of three limited exceptions: (1) the "emergency" exception; (2) the "obvious need" exception; or (3) the "medical necessity" exception. An emergency situation exists when an eligible child experiences pain, infection, or swelling in the oral cavity. Record, vol. 6 at 63 (Testimony of Cecil Chandler, Senior Dental Consultant, TDHR). An obvious need situation exists when the recipient, a parent, a teacher, or any other interested person actually observes a clear dental problem. *Id.* at 67.

1. Topical fluoride is a chemical applied by a dentist to form a protective chemical blanket on the outside of the tooth. It temporarily helps avert tooth decay, and, when there is an incipient cavity, it can "remineralize" the tooth—restore missing protective material and reverse the progress of decay. Record, vol. 10 at 64–67.

2. Root canals are necessary when the interior of a tooth is affected by decay. The hollow chamber inside the tooth becomes filled with debris and bacteria; it becomes infected, and tissue becomes gangrenous. Infected pulp can cause excruciating pain. A root canal flushes and cleans the hollow chamber, and hermetically seals it so that debris and bacteria can no longer form. Once repaired, the tooth can function for many years—even a lifetime. *Id.* at 156–57.

3. Fixed space maintainers preserve proper spacing of teeth. Widely accepted, simple, and inexpensive appliances, space maintainers can often avert the need for orthodonic treatment in the future. *Id.* at 163–67. Since the Texas EPSDT program does not provide coverage for orthodontia, Record, vol. 11 at 335, the availability of these preventive appliances is particularly important.

4. Posterior partials are dental appliances customarily used to replace three or four missing teeth. Record, vol. 10 at 190–91. Partials serve as substitute teeth, preserving space and permitting chewing. *Id.* at 192.

5. A porcelain crown over nonprecious metal replaces the tooth structure where the tooth is so destroyed that a filling will not adhere to it. It is a well-established, nonexperimental procedure whereby a cast is made so that the crown is fitted to the contours of the individual tooth. *Id.* at 182–84. The need for such crowns is extensive in the population of EPSDT children. *Id.* at 185.

6. A frenulectomy is a surgical procedure used to treat abnormal growth of the frenulum—the piece of ligament-like tissue connecting the bottom of the tongue to the tissue behind the lower teeth. If the frenulum is connected to the tip of the tongue rather than the back of the tongue, the child is said to be "tongue-tied." *Id.* at 176–77. However, the record reveals that frenulectomies are seldom dealt with in the routine dental practice. Instead, the tongue-tied child is generally referred to a surgeon—sometimes a plastic surgeon. *Id.* at 180.

Finally, a situation of medical necessity exists when a recipient has a dental problem that will adversely affect the child's overall health unless immediately treated. *Id.* at 63. TDHR also removed several previously available dental services from the EPSDT program, namely: (1) topical fluoride; (2) posterior root canals; (3) fixed space maintainers; (4) partial dental appliances on posterior teeth; (5) porcelain crowns; (6) antibiotic injections; (7) frenulectomies; and (8) nonsymptomatic extraction of impacted teeth.

TDHR's "proposed" changes in the EPSDT program were proposed for permanent adoption by publication in the Texas Register on September 21, 1979. *See* Volume 4 Tex.Reg. 3385 (Sept. 21, 1979). However, the elimination of the eight aforementioned dental services actually occurred in May and July of 1979 and the triennial access schedule went into effect on September 1, 1979. Clearly, no prior actual notice of the cutbacks was provided to eligible recipients. Record, vol. 3 at 458.

In summary, whereas the pre-1979 EPSDT program provided eligible children with annual preventive and restorative dental checkups and several available basic dental procedures to maintain eligible children's dental health, the post-1979 EPSDT program provides eligible children with triennial preventive checkups and allows the treating dentist to treat a detected dental problem arising in between the three-year visits only if it falls within the limited exceptions of emergency, obvious need, or medical necessity. Moreover, eight basic dental services available under the 1979 program are no longer available to the treating dentists under the post-1979 EPSDT program.

## II. Course of Proceedings

Stephanie and Stephen Mitchell, through their mother and next friend, Ruthie Mitchell, joined with the Austin Welfare Rights Organization of Austin, Texas, and initiated this action against Marlin W. Johnston, acting Commissioner of TDHR, Hilmar G. Moore, William T. Bray, and Raul Jimenez, members of the State Board of Human Resources. Plaintiffs alleged that the 1979 EPSDT cutbacks deprived them of substantive and procedural due process and divested them of benefits to which they were entitled under federal law.[7] Specifically, plaintiffs sought to enjoin the reductions, to have the reductions declared in noncompliance with the federal program, to force the defendants to provide notice of the available benefits to each eligible recipient, and to represent a class of all similarly situated recipients. After discovery but before trial, Sylvia and Alex Benson sought to intervene as plaintiffs.

On October 28, 1981, a pretrial hearing was held and the district court granted the Bensons' motion to intervene, denied class certification, and denied the defendants' motion to dismiss. A two-day trial was held on the merits before the district judge who, at the conclusion of the trial, certified a class action consisting of "all persons under twenty-one who were receiving Medicaid at least ten days before the date on which a reduction or termination of EPSDT dental benefits occurred . . ., and who are currently receiving Medicaid benefits." Record, vol. 4 at 811. Thereafter, the district judge took the case under advisement.

On January 30, 1982, the district judge issued a Declaratory Judgment and Memorandum Opinion. The district judge concluded that "Texas triennial periodicity schedule, with its present exceptions . . . fails to provide access to dental care sufficient in amount, scope and duration to achieve the preventive, maintenance and restorative purposes of the program." Additionally, with regard to the eight eliminated dental services, the district court basically concluded that seven of the eight procedures had been deleted for improper purposes "wholly unrelated to the accomplishment of the purpose of EPSDT legislation

---

**7.** The district court concluded that "Plaintiffs' interest in adequate dental care became an entitlement when Texas agreed to accept Medicaid funding in exchange for compliance with certain mandatory programs such as EPSDT." This finding cannot be seriously disputed.

and that the resulting schedule of services failed to adequately promote the purposes and requirements of the program." Since the district court was able to dispose of the case on statutory grounds alone, it properly refused to address the plaintiffs' constitutional allegations. *Dandridge v. Williams,* 397 U.S. 471 at 475–6, 90 S.Ct. 1153 at 1156–7, 25 L.Ed.2d 491 (1969) and authority cited therein. Finally, the district court concluded that the plaintiffs received inadequate notice of the EPSDT changes.

Rather than constructing a substitute EPSDT program, however, the district court allowed the defendants thirty days to present the district court with a new schedule of periodicity and allowable procedures. TDHR requested an extension to consult with its Dental Professional Advisory and Review Committee,[8] asking it to recommend a "good basic dental care program." Record, vol. 4 at 755. Thereafter, TDHR submitted a proposed plan that failed to reinstate several of the procedures that the district court had found necessary to a minimally acceptable program and offered services inferior to those recommended by its own advisory committee on dental health.

TDHR's Advisory Committee recommended reinstatement of annual periodicity and recommended that TDHR reinstate the following procedures: (1) topical fluoride; (2) posterior root canals; (3) cast crowns; (4) fixed space maintainers; and (5) partial dental appliances on posterior teeth. *Id.* at 754–55. However, the proposed compliance plan actually presented to the district court by TDHR offered services drastically inferior to the Advisory Committee's recommendations. In addition, TDHR's proposed compliance plan almost totally ignored the express findings of the district court. In fact, TDHR offered to reinstate annual periodicity for only one year, and offered only two of the seven services found minimally necessary by the district court—topical fluoride and posterior root canals. *Id.* at 747. Moreover, TDHR limited the duration of its entire offer to one year. *Id.*

▪ Thereafter, the district court rejected TDHR's proposal and ordered reinstatement of annual access to preventive dental care, ordered reinstatement of the eliminated dental services the district court had deemed necessary to the advancement of the program's purposes, required notice of the reinstated services to be given qualified recipients,[9] and, as will be more fully dis-

---

**8.** The Dental Professional Advisory and Review Committee is an advisory body that Texas, as a participating state, is required to establish. *See* 42 C.F.R. § 431.12. The Texas Committee includes distinguished dentists from several areas of dental expertise.

**9.** The district court held at the preliminary injunction hearing in this case that the plaintiffs had received notice inadequate under the standards set forth by federal law. *See* 42 C.F.R. § 431.210. After trial, in its Declaratory Judgment and Mémorandum Opinion, the district court adhered to this finding of inadequate notice. However, rather than ordering that notice be given of the cutbacks, the district court wisely held over the issue of notice until the decision on the merits had been conducted. But, after the district court concluded that the cutbacks violated federal law, and after the district judge granted TDHR 30 days to submit a compliance plan, which TDHR failed to do successfully, the district court ordered that TDHR give all eligible EPSDT recipients notice of the extent of services reinstated by the district court. Record, vol. 5 at 1070.

This Court has little difficulty concluding that the plaintiffs and the class they represent re-

ceived inadequate notice. The pertinent regulatory provision requires notice be given eligible recipients "if the Medicaid agency takes action to suspend, terminate, or reduce services." 42 C.F.R. § 431.200. Clearly, the 1979 EPSDT cutbacks constituted both a "termination" and "reduction" of available benefits. Thus, notice was required.

The type of notice required is outlined in clear terms in the federal regulations. *Id.* at § 431.210. The notice must be given to "every recipient ... in writing." *Id.* at § 431.206(b). And, more importantly, the notice must be mailed at least 10 days before the action requiring notice is taken, unless the case falls within certain exceptions not requiring *prior* notice. *Id.* at § 431.211. Both sides agree that none of the exceptions apply. Record, vol. 3 at 460. In light of these factors, it is difficult to understand why TDHR claims to have given prior notice. The publication of the cutbacks in EPSDT benefits was dated September 21, 1979. But, the cutbacks in dental services actually occurred in May and July of 1979, and the triennial access schedule went into effect on September 1, 1979. Moreover, it is clear that each recipient did not receive actual written

cussed *infra,* awarded attorneys' fees to certain of the plaintiffs' attorneys and denied fees as to two others. Defendants-appellants perfected an appeal to this Court raising a host of issues and plaintiffs have filed a cross-appeal seeking reversal of the district court's decision to deny attorneys' fees to the two CDF lawyers.

### III. *Jurisdiction*

Defendants-appellants contend that the district court lacked jurisdiction to hear this matter. According to defendants, no jurisdiction existed in the district court since the plaintiffs' constitutional claims were frivolous and were brought solely for the purpose of invoking jurisdiction. Also, defendants argued that no jurisdiction existed since the plaintiffs' constitutional claims are generalized in violation of the principles of *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Finding jurisdiction aside and apart from the plaintiffs' constitutional claims we affirm the district court's conclusion that it had jurisdiction, and, accordingly have no occasion to discuss defendants' attacks upon plaintiffs' constitutional allegations.

As noted previously, plaintiffs complaint alleges that the cutbacks in EPSDT services violated their rights to substantive and procedural due process and divested them of benefits they are entitled to under federal law. Significantly, plaintiffs' allegation that Texas has deprived them of their statutorily guaranteed rights is based upon 42 U.S.C. § 1983. In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court held that "suits in federal court under section 1983 are proper to secure compliance with the provisions of the Social Security Act on the part of participating states." *Id.* 100 S.Ct. at 2504, *quoting Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

■ The convincing similarity between the case *sub judice* and *Maine v. Thiboutot* leads this Court to the conclusion that the district court did have jurisdiction. As in *Thiboutot* the plaintiffs, individuals unarguably entitled to the benefits they seek,[10] initiated this section 1983 action to force Texas, a participating state, to live up to its end of the cooperative program. Having alleged a valid section 1983 action, the plaintiffs successfully invoked the district court's jurisdiction under 28 U.S.C. § 1343, which provides original federal court jurisdiction in suits authorized by section 1983. Since jurisdiction existed in the district court to hear the plaintiffs' section 1983 action and since this case can be disposed of on statutory grounds alone, consideration of appellants' claims concerning the plaintiffs' constitutional allegations is unnecessary. *Dandridge v. Williams,* 397 U.S. at 475–76, 90 S.Ct. at 1156–57. Simply put, even if the plaintiffs' constitutional claims were insufficient to invoke federal jurisdiction, and this Court expresses no opinion on this matter, jurisdiction would still be found under the reasoning advanced in *Thiboutot,* 100 S.Ct. at 2504.

### IV. *Class Action Certification*

■ Appellants next contend that the district court erred by certifying a class action. Specifically, they argue that class certification was unnecessary, that the class definition is overbroad, and that the plaintiffs are not proper class representatives. Cognizant of the standard of review that requires this Court to affirm the district court's decision on class certification absent an abuse of discretion, this Court rejects each of appellants' contentions and affirms the district court's certification of this class action. *See Johnson v. City of Opelousas,* 658 F.2d 1065 (5th Cir.1981).

### A. *The Necessity of Class Certification*

According to appellants, class certification was unnecessary as it "served no useful

---

notice. Unless the recipient happened to be reading through the appropriate volume of the Texas Register, the recipient would have had no knowledge of TDHR's actions. Hence, this Court affirms the district court's finding of in-

adequate notice and affirms the district court's decision to require TDHR to inform eligible recipients of the existing available services.

**10.** *See* note 7, *supra.*

function" and "merely added to the discovery burdens and attorneys' fees obligations of appellants . . . ." However, as was previously noted, plaintiffs' original complaint sought restoration of benefits, including notice of the restoration of such benefits. It would indeed be difficult for the plaintiffs to obtain the requested relief absent certification of a class action. Initially, since the plaintiffs had actual notice of the EPSDT cutbacks, they would not appear to have standing to raise the argument that would require the defendants-appellants to give notice of the reinstated benefits to the eligible recipients who had no actual notice. Also, plaintiffs would be unable to obtain classwide notice if no class action was certified since the other eligible recipients would not be parties to this litigation and would not be entitled to the benefits of the district court's judgment. This is not a case in which the plaintiffs simply attack the facial validity of a statute and seek to have it declared unenforceable. See *Johnson v. City of Opelousas*, 658 F.2d at 1069 n. 5 and cases cited therein. Nor is this a case in which the litigants being sued have agreed to apply the court's judgment on a classwide basis. *Id.* To the contrary, plaintiffs sought not only declaratory and injunctive relief, but moved the district court to require appellants to give notice to all eligible EPSDT children of the reinstatement of their guaranteed benefits. This class action was, therefore, "necessary." [11]

### B. *Adequacy of the Class Definition*

■ Defendants-appellants maintain that the district court's definition of the scope of this class action is vague and overbroad. Appellants attempt to support this assertion by arguing that the class definition does not require the Medicaid recipient to be qualified to participate in the state EPSDT program. This contention is without merit. Suffice it to say that since EPSDT is only available to Medicaid recipients under the age of twenty-one, but is available to all such children, the district court adequately restricted the class to "all persons under twenty-one who were [or are] receiving Medicaid . . . ." The district court's definition certainly does not represent an abuse of discretion.

### C. *The Adequacy of Plaintiffs as Class Representatives*

■ Appellants' final argument against class certification asserts that the plaintiffs are not adequate class representatives. Appellants argue that the plaintiffs do not "possess the same interest [or] suffer the same injury" as the other class members. *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977). However, the record demonstrates that the Mitchell and Benson children were directly and seriously harmed by the substantial EPSDT reductions and that their injuries are representative of the inevitable consequences attendant to the extensive cutbacks in EPSDT benefits. Because Stephanie Mitchell's dentist was unable to provide the necessary EPSDT preventive and restorative care for her teeth in 1980 and 1981, her dental infection invaded the pulp of her teeth and caused her excruciating pain. Record, vol. 3 at 459–60, vol. 10 at 105–06. Additionally, because of the EPSDT reductions, Stephen Mitchell's dentist was unable to provide the preventive and restorative dental care envisioned and required by the statute. As a result, Stephen's condition will either require extraction of the infected tooth, or a complicated root canal. None who have closed their eyes and exposed their teeth to the probing drill of a dentist can seriously allege that no injury has been suffered by Stephen and Stephanie. Moreover, we do not find these injuries dissimilar to those foreseeably attendant to the EPSDT cutbacks as they affect other eligible children.

With regard to the Bensons, TDHR's own expert witness who examined Alex and Sylvia recommended that they be recalled in six months so that Alex's incipient lesions

---

**11.** Since this Court concludes that class certification was "necessary," we need not decide whether lack of need is a valid basis for denial of class certification. *See Johnson v. City of Opelousas*, 658 F.2d at 1069–70 n. 5 and corresponding text.

could be treated with topical fluoride (a service cut in 1979) and so that Sylvia's gingivitis could be monitored. Record, vol. 7 at 179–81. However, in light of the triennial periodicity program and the reduction in available services, the children would receive treatment only if their condition developed into an emergency, obvious need, or medical necessity situation. This, as the expert witness testified, is inadequate preventive and restorative dental procedure. Record, vol. 7 at 54–57. Once again, this Court notes that we find nothing peculiar with the named plaintiffs' conditions. Their injuries, we are persuaded, are similar to those foreseeably attendant to the extensive cutbacks in EPSDT services. Indeed, the plaintiffs have the same interests and suffer the same injuries as those they represent.

In summary, this Court must conclude that the district court did not abuse its discretion by certifying the instant class action.

## V. The EPSDT Cutbacks and the Requirements of Federal Law

At the heart of the district court's opinion is its conclusion that the EPSDT cutbacks violate the requirements of federal law. The district court framed this difficult issue in the following manner: "Does the state EPSDT program reasonably attempt to accomplish the purposes of the Act?" The district court concluded that the cutback state EPSDT program did not reasonably attempt to accomplish the purposes of the Act and this Court agrees.

At the outset, it is noted that this Court ploughs no new ground when it exercises jurisdiction over this case. Well-established precedent requires this Court to determine whether Texas has complied satisfactorily with the requirements of federal law, requirements established by Congress—not this Court. See Bond v. Stanton, 655 F.2d 766 (7th Cir.1981); Rush v. Parham, 625 F.2d 1150 (5th Cir.1980); Curtis v. Taylor, 625 F.2d 645 (5th Cir.1980); Hodgson v. Board of County Commissioners, 614 F.2d

601 (8th Cir.1980); Philadelphia Welfare Rights Organization v. Shapp, 602 F.2d 1114 (3d Cir.1979), cert. denied, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980); Preterm, Inc. v. Dukakis, 591 F.2d 121 (1st Cir.1979).

■ Early precedent recognized Congress' power to "fix the terms on which it shall disperse federal money to the states." Oklahoma v. Civil Service Commission, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947). As the Supreme Court has noted, "legislation enacted pursuant to the Spending Power is much in the nature of a contract: in return for federal funds, the states agree to comply with federally imposed conditions." Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). Hence, when a state voluntarily and knowingly accepts the terms of the federal-state "contract," as Texas has done in the case sua sponte, it is required to fulfill its mandatory obligations under the contract. This is the quid pro quo. Id. 101 S.Ct. at 1539. Whether Texas has fulfilled its obligations is the critical inquiry. Such a determination necessarily requires this Court to ascertain the purposes behind the EPSDT legislation by delving into the Act's legislative history.

■ Medicaid was enacted in 1965 in an attempt to replace prior, less adequate medical assistance programs. For the first time, participating states were required to provide a minimum federally defined package of services that Congress considered "essential." H.R.Rep. No. 213, 89th Cong., 1st Sess. 9–10, 70 (1965). Qualified recipients are entitled to this minimum package of mandatory services under 42 U.S.C. § 1396a.[12]

Among the categories of medical assistance services that states are required to provide under section 1396a(a)(10)(A) is EPSDT, which requires the participating state to provide:

such early and periodic screening and diagnosis of individuals who are eligible

12. See note 7, supra.

under the plan and are under the age of 21 to ascertain their physical or mental defects, and such health care, treatment, and other measures to correct or ameliorate defects and chronic conditions discovered thereby, as may be provided in regulations of the Secretary.

42 U.S.C. § 1396d(a)(4)(B). In discussing this bill, then HEW Secretary John Gardner stated:

In low-income areas, we estimate that six out of every ten children who suffer from one or more chronic conditions are not receiving any treatment.

*     *     *     *     *     *

Children begin to suffer from dental caries very early. By age 5, a child has an average of three carious teeth. By age 15, the average youth has 11 permanent teeth damaged or destroyed.

*     *     *     *     *     *

In most instances, this complete loss is unnecessary and *preventable* .... *Periodic, regular dental care would prevent the progression through decay to complete loss.* And the majority of children do not get periodic dental attention. Sixty-five percent of our poor children have not seen a dentist in the past year.

Hearings Before the Committee on Ways & Means Regarding H.R. 57–10, at 189–191 (emphasis added).

Such legislative history supports the plaintiffs' contention that the EPSDT program was enacted in a clear attempt to provide *preventive* dental services to the children of Medicaid recipients, in Congress' view, children foreseeably destined to become Medicaid recipients in their own right. A program of preventive dentistry was deemed necessary to protect the children's teeth and to avoid the development of chronic or irreversible dental problems, problems far more costly to alleviate than to detect and prevent.

In 1972, concerned with participating states' apparent refusal to adequately assure that eligible children knew of and obtained the services provided by the applicable law, Congress added certain state administrative performance requirements. 42 U.S.C. § 603(g), as added by Pub.L. 92–603, § 299F. States were required to "inform all families ... of the availability of child health screening services under ... Title XIX ...." and to affirmatively arrange for screening and the necessary treatment of detected dental problems. *Id.*

In 1981, these outreach and performance standards became conditions of federal funding under the Medicaid program. As noted, the Secretary of HEW was delegated authority to establish the contours of the federal program. 42 U.S.C. § 1396d(a)(4)(B) specifically provides for "such [EPSDT services] as may be provided in regulations of the Secretary." The regulations subsequently promulgated by the Secretary of HEW lead this Court to conclude that the district court did not err in its conclusion that "the program was designed to be an affirmative program aimed at reducing future Medicaid expense by detecting and remedying incipient dental problems with children who could reasonably be anticipated to become adult Medicaid recipients." The Secretary's regulations are "entitled to more than mere deference." *Schweiker v. Gray Panthers,* 453 U.S. 34, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981).

The regulations promulgated by the Secretary leave little doubt as to the purposes of the EPSDT program. For example, 42 C.F.R. 441.56(b)(2) requires participating states to provide eligible children with the "dental care needed for relief of pain and infections, restoration of teeth and *maintenance of dental health.*" (emphasis added). Indeed, HEW's Medical Assistance Manual provides that: "As a minimum, the dental services that must be provided include emergency services, *preventive services,* and therapeutic services for dental diseases which, if left untreated, may become acute dental problems or may cause irreversible damage to the teeth or supporting structures ...." MSA–PR 6–21 (June 28, 1972), 2 Medicine & Medicaid (CCH) ¶ 14551.17 (Nov. 9, 1971). *See also Philadelphia Welfare Rights Organization v. Shapp,* 602 F.2d 1114, 1122 (3d Cir.1979), *cert. de-*

*nied,* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980); *Stanton v. Bond,* 504 F.2d 1246 (7th Cir.1974).

Further explication of the legislative history of the EPSDT program is unnecessary. Suffice it to say, that the legislative history of EPSDT demonstrates a clear congressional desire to require participating states to provide eligible children with a comprehensive *preventive* dental program. As the Seventh Circuit concluded in *Stanton v. Bond,* 504 F.2d at 1251, "the mandatory obligation upon each participating state to aggressively notify, seek out and screen persons under 21 in order to detect ... problems and to pursue those problems with the needed treatment is made unambiguously clear by the 1967 act and by the interpretative regulations and guidelines."

With this recognition of the program's purposes in mind, the question becomes whether Texas is providing the eligible children with services sufficient in "amount, duration, and scope to reasonably achieve these purposes." *See* 42 C.F.R. § 440.-230(b). The answer to this question requires discussion of the reduced schedule of periodicity and the reduction of available services.

### A. *Periodicity*

■ Prior to 1979, EPSDT-eligible children were entitled to annual preventive dental checkups. Under the current program, eligible children are entitled to preventive checkups only every three years. Finding a plethora of evidence in support of the district court's finding, we conclude, as did the district court, that "Texas triennial periodicity schedule, with its present exceptions ... fails to provide access to dental care sufficient in amount, scope, and duration to achieve the preventive, maintenance and restorative purposes of the program."

Several expert witnesses, including TDHR's own expert, testified that triennial access to preventive dental services is wholly inadequate to meet the reasonable dental needs of the children. Record, vol. 10 at 135, 139–66, 276–77. In fact, ideally, a preventive dental checkup would occur every six months, or more frequently, if the child has a high incidence of dental problems. *Id.* at 130, 276. Nevertheless, expert testimony did indicate that a minimally acceptable schedule requires annual dental checkups. As one expert observed: "to suggest a periodicity of more than one year and to try to disguise this as a satisfactory program of child preventive health, of course, is ridiculous." *Id.* at 66. Hence, this Court refuses to disturb the district court's finding that Texas has failed to fulfill its obligations under EPSDT by enacting a dental program that provides triennial access to preventive dentistry. To do otherwise, would require this Court to substitute its opinion for that of the dental expert witnesses.

Finally, we note that the limited exceptions to triennial access to preventive care do not save the current EPSDT program from our finding that Texas has failed to comply with the program's preventive requirements. The expert testimony indicates that, even with the emergency, obvious need, and medical necessity exceptions, children are unable to obtain adequate preventive care under the existing program. For example, if a dentist noticed an incipient cavity in an eligible child's tooth in between the child's three-year checkups, no action could be taken by the treating dentist unless and until the tooth developed into an emergency, medical necessity, or obvious need situation. In effect, the dentist would be forced to forego treatment of a detected dental problem until it culminated in a more serious, perhaps irreversible dental problem; a dental procedure that would require a greater expenditure of state and federal funds than would have been needed to prevent and correct the child's detected dental condition. This the defendants-appellants conceded at oral argument. As noted, the federal regulations and guidelines envision and require a program of preventive dental health. This is not provided under the triennial access program, even with its limited exceptions.

### B. *The Schedule of Available Services*

In addition to the change in periodicity, TDHR eliminated eight basic dental serv-

ices from the program's coverage. The district court concluded that seven of the eight services were eliminated for purposes inconsistent with the program's mandatory requirements and that the resulting package of available services "denies preventive, restorative and maintenance care to a child solely because of the child's diagnosis, type of illness, or condition." Finding ample evidence to support the district court's findings, we affirm.

### 1. Topical Fluoride

■ The district court concluded that TDHR's reasons for eliminating the availability of topical fluoride treatments were aimed "solely . . . at reducing the EPSDT budget." This action, as the district court concluded, ignores and frustrates the preventive purposes of EPSDT legislation. The expert witnesses, including TDHR's expert, concluded that a minimally acceptable preventive dental program requires annual applications of topical fluoride. *Id.* at 82, 91, 196, 278. Indeed, as TDHR's program administrator stated, "Properly applied fluoride applications on a regular and continuing basis are necessary to a preventive program." Record, vol. 11 at 331. *See also* Record, vol. 3 at 457, vol. 10 at 81.

### 2. Posterior Root Canals

■ The district court concluded that "the decision to eliminate posterior root canals was not related to accomplishing the purposes of the federal legislation, was based on the type of condition to be treated, and ignored the preventive and restorative purposes of EPSDT legislation." The expert testimony supporting this finding is unarguably strong. The record indicates that root canals are a vital restorative procedure in that they save damaged teeth from extraction. As one dentist testified, extractions promote problems with migration of teeth, caries, and periodontal disease. Record, vol. 10 at 157–60. Moreover, the testimony demonstrates that a highly significant proportion of EPSDT children will need root canal treatment. *Id.* at 161–62. TDHR's refusal to add root canals to

the schedule of available services results in a program "that destroys the very tooth . . . we are trying to save." *Id.* at 161. This is facially inconsistent with the program's purposes.

### 3. Fixed Space Maintainers

■ Although the district court found that the availability of fixed space maintainers was not necessary in all situations, it did conclude that "in certain situations, provision of fixed space maintainers is necessary to accomplish the preventive purposes of the federal legislation." This finding is adequately supported by the record. The experts agreed that without fixed space maintainers, a dentist would be incapable of reasonably achieving maintenance of dental health by treating problems of space maintenance. *Id.* at 175–76, 281.

### 4. Partial Dental Appliances on Posterior Teeth

■ In the district court's words, "The elimination of partial dental appliances on posterior teeth was not based on medical necessity but, rather, on the type of condition to be treated, and was wholly unrelated to the accomplishment of the purpose of EPSDT legislation." This finding is also well supported by the record. Expert testimony established a fairly extensive need for the eliminated appliance. *Id.* at 191–92. Elimination of the appliances could result in periodontal disease, and shifting, misalignment, and possible destruction of front teeth. Indeed, this cutback, coupled with the elimination of posterior root canals, removed all of the basic approaches available to a dentist to deal with diseased or missing posterior teeth. TDHR's refusal to cover root canals for posterior teeth meant that seriously damaged teeth would have to be removed. Once removed, however, the posterior teeth could not be replaced with dentures unless the dentist removed more of the child's teeth—including healthy teeth. This is the type evidence that led the district court and the experts to the conclusion that the remaining list of allowable procedures was inadequate to meet the needs

served by a restorative dental program. *Id.* at 192–93.

### 5. *Porcelain Crowns*

■ Like most of TDHR's deletions, the deletion of porcelain crowns was found to have been based upon reasons inconsistent with the accomplishment of the program's preventive purposes. Defendants-appellants argue that the provision of stainless steel crowns remedies any inadequacies caused by elimination of porcelain crowns. However, the evidence indicates that stainless steel crowns are typically used for three to four years at a maximum, and then only on primary (baby) teeth that will be lost and do not, therefore, require a carefully fitted permanent crown. Also, the evidence demonstrates that use of stainless steel crowns for children fourteen years or older may cause serious complications, including periodontal disease. *Id.* at 186–88. Absent the availability of porcelain crowns and with no other adequate available substitute, the preventive and restorative purposes of EPSDT are seriously compromised. *Id.* at 187.

### 6. *Antibiotic Injections*

■ The district court made the following finding with regard to the elimination of antibiotic injections.

> This procedure is available to recipients under Medicaid, but it is not clear to the Court how Defendants anticipate that a treating dentist should insure that an EPSDT patient receive the injection when necessary if the dentist himself cannot provide it. If, under these regulations, the dentist can provide the injection and use Medicaid rather than EPSDT funds, the elimination of the injections by Defendants is proper; however, if a dentist cannot provide this care under EPSDT regulations, the elimination disregards medical necessity and is unrelated to the accomplishment of the purposes of EPSDT legislation.

The appellants fail to demonstrate that the elimination of this service was proper in that a dentist could provide the child with antibiotic injections under Medicaid legislation. This, the defendants-appellants failed to do, even though the district court gave them thirty days to propose a solution. Hence, finding support for the district court's finding that this service is necessary to the advancement of EPSDT legislation, we affirm the district court's decision to require reinstatement of this necessary procedure. *See* Record, vol. 10 at 197–98 (injection can arrest severe infection); *id.* at 198 (an untreated infection can ultimately attack the brain).

### 7. *Frenulectomies*

■ The district court found the elimination of this procedure proper since the evidence indicated that most frenulectomies were performed incorrectly and did not serve their intended purpose. The plaintiffs did not attack these findings in their cross-appeal and, accordingly, this Court must affirm the district court's finding in this respect.

### 8. *Nonsymptomatic Extraction of Impacted Teeth*

■ The district court also concluded that nonsymptomatic extraction of impacted teeth was a necessary EPSDT service and we agree. The testimony at trial clearly indicated that dental conditions do not always manifest themselves in the form of overt symptoms. Thus, the district court correctly held that the purposes of the program were frustrated since the treating dentist was required to wait until the condition culminated in overt, painful, costly symptoms before extraction was an allowable procedure. Record, vol. 4 at 775. Quite clearly, several severe dental problems could develop without overt symptoms. Record, vol. 10 at 199–200. Hence, the elimination of this medically necessary service was improper.

In summary, this Court holds that the district court's conclusion that seven of the eight eliminated procedures unduly frustrated the purposes of EPSDT legislation is factually and logically sound. The record indicates that seven of these services were

necessary to the fulfillment of the program's purposes, and that the services were deleted for reasons wholly unrelated to the legislative intent surrounding EPSDT's enactment, albeit, understandable reasons in light of Texas' drastic cutback in EPSDT funding. Nevertheless, since Texas voluntarily and knowingly entered into the cooperative program, fully aware of its requirements, it must bear the responsibilities and requirements of its participation.

## VI. *Attorneys' Fees*

The district court properly noted that attorneys' fees are available to a prevailing party in a section 1983 action. As the Supreme Court held in *Maine v. Thiboutot,* "There can be no question that Congress passed the Fees Act anticipating that it would apply to statutory section 1983 claims." *Maine v. Thiboutot,* 100 S.Ct. at 2507. However, when the plaintiffs employed two attorneys from CDF and these attorneys sought *pro hac vice* admission to the case, the district court conditioned their admission upon a relinquishment of any claim for attorneys' fees. CDF lawyers strenuously objected and noted their exception to the judge's ruling, which was based upon the district court's conclusion that additional attorneys were "unnecessary." Finding the district court's decision to condition the CDF's attorneys' admission upon a relinquishment of attorneys' fees in conflict with binding precedent, this Court reverses the district court's decision in this respect and remands the case for a determination of whether special circumstances, other than the district court's subjective determination as to the need of additional counsel, exist to prevent an award of attorneys' fees under section 1988 and its interpretative precedent. Of course, should the district court conclude that no special circumstances prevent an award of fees, a determination of the amount of fees due would then need to be made in accordance with this Court's holding in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974) and its progeny.

In *Sanders v. Russell,* 401 F.2d 241 (5th Cir.1968), this Court specifically held that an attorney's *pro hac vice* admission could not be rejected simply because the district court felt that additional counsel was unnecessary. The Court stated:

Apart from the Rule (the rule does not attempt to prohibit *pro hac vice* admission simply because the court may determine that certain lawyer's participation in a given case is unnecessary), lack of necessity—in the judge's view—simply is not and cannot be a proper basis for exclusion in these cases. The trial court cannot substitute its judgment for that of the litigant in the choice or number of counsel that the litigant may feel is required to properly represent his interests.

*Id.* at 246. In light of this holding, we must hold that the district court erred by conditioning the CDF attorneys' admission upon the relinquishment of a claim for fees simply because the district court felt their assistance was unnecessary.

We emphasize that the district court still has discretion to determine the appropriate extent and amount of an award under the factors outlined in *Johnson* once the admitted attorneys make a claim for attorneys' fees. The district court is certainly not restrained by our holding from determining the reasonable amount of time and effort that warrants an award of fees. This does not, however, give the district court discretion to eliminate wholesale the services of attorneys who have admittedly performed competent nonduplicative work. In this case, the record indicates that the CDF attorneys were careful to keep close records of their time and they also attempted and succeeded in avoiding claims for duplicative work.[13] The CDF attorneys rendered competent, necessary counsel on a large part of the pre-trial and post-trial briefs. As stated in *Tasby v. Estes,* 651 F.2d 287 at 288 (5th Cir.1981): "If [they are] not compensated for such work—which had to be done by someone—no one will be."

**13.** *See* Appendix A.

VII. *Conclusion*

This Court notes that it is cognizant of the sensitive nature of these proceedings. We recognize that complex fiscal policies are involved in this case and that the determination of the proper scope and availability of social programs is a determination best left to the federal and state political processes. Ideally, in a system of cooperative federalism, the federal and state governments would not only agree on the minimum societal needs of the unfortunate, but would cooperate in the provision of such services—services that would adequately satisfy the minimum requirements agreed upon by the sovereigns in the most economical manner available. Realistically, however, cooperative social fiscal programs lead to disputes as to the requirements of the undertaking and the rights of the individuals sought to be benefitted. As a consequence, tribunals such as this are required to resolve disputes in areas in which, quite frankly, little judicial expertise exists. We are, nonetheless, required by our oaths as is the district judge who tried this case, to interpret and uphold the laws of the land; in this case, laws admittedly dealing with issues of grave political and social consequence. As noted in *Rosado v. Wyman,* 397 U.S. at 422–23, 90 S.Ct. at 1222–23 "it is . . . peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress has attached to their use."

In the exercise of our duties we have, as did the district court, come to the inevitable conclusion that the State of Texas has failed to fulfill its obligations under the EPSDT program. Texas voluntarily chose to accept the benefits of federal funding and must, therefore, voluntarily perform its obligations under the system of cooperative federalism. This, quite simply, it has not done. Accordingly, the district court's conclusion that the changes in EPSDT services violate federal law is affirmed, but for the previously stated reasons, the case is remanded to the district court for further proceedings on the issue of the CDF lawyers' attorneys fees.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

## APPENDIX A

COMPARISON OF HOURS BILLED FOR PLEADINGS
BY LEGAL AID SOCIETY (LAS) AND
CHILDREN'S DEFENSE FUND (CDF) ATTORNEYS
JULY 1981 – APRIL 1982

(Chart compares hours for which compensation was sought below and includes researching, drafting, proofreading, conferences with co-counsel regarding pleadings)

– = no hours billed

| | BARBARA HINES (LAS) | REGINA ROGOFF (LAS) | NANCY EBB (CDF) | SARA ROSENBAUM (CDF) |
|---|---|---|---|---|
| 1. Motion to Compel | 6:00 | :20 | – | – |
| 2. Motion to Intervene | 8:00 | – | – | – |
| 3. Conferences on intervention, *pro hac vice,* and other matters | :45 | – | .5 | – |
| 4. Motion for Admission *pro hac vice* | – | – | .5 | – |
| 5. Motion to Reconsider *pro hac vice* | – | – | 5.25 | – |
| a. Hines Affidavit | :20 | – | – | – |
| 6. Motion to Produce | :20 | – | – | – |

| | BARBARA HINES (LAS) | REGINE ROGOFF (LAS) | NANCY EBB (CDF) | SARA ROSENBAUM (CDF) |
|---|---|---|---|---|
| 7. Motion for Partial Summary Judgment | – | – | 21.0 | 1.5 |
| 8. Motion to Dismiss Party | :10 | – | – | – |
| 9. Pre-Trial Memorandum | – | – | 11.5 | 3 |
| 10. Pre-Trial Order | | | | |
| a. Contested issues of law and fact | :15 | – | – | – |
| b. Proposed findings of fact | 3:30 | 4:15 | – | – |
| c. Exhibits | 1:30 | – | – | – |
| d. Conference with defendants' counsel | 7:15 | – | – | – |
| e. Conclusions of law | – | – | 1.5 | – |
| f. Redrafting stipulations in consultation with defendants | 6:30 | – | 1.5 | – |
| g. Integrating defendants' pretrial order proposals into final order | 6:00 | – | – | – |
| h. Consultation with co-counsel (including other issues) | 5:25 | – | 2.0 | – |
| i. Proofreading | :45 | – | 1.0 | – |
| j. Editing and rewriting | – | – | 8.5 | – |
| 11. Response to Memorandum in Opposition to Motion for Partial Summary Judgment | :15 (supporting affidavit) | – | 4.0 | – |
| 12. Supplemental Pre-Trial Memorandum | – | – | 1.75 | – |
| 13. Motions to Allow Deposition Testimony, Non-Stenographic Deposition | :40 | – | – | – |
| 14. Response to Motion for Sanctions | :30 | – | – | – |
| 15. Motion to Extend Time | :25 | – | – | – |
| 16. Motion to Expedite | :20 | – | – | – |
| 17. Motion for Reconsideration of Class Certification and Response | 9:55 (including consultation on other issues) | – | .5 | – |
| 18. Post-Trial Memorandum | – | – | 21.0 | 16.0 (jurisdictional issues) |
| 19. Opposition to Defendants' Motion to Extend Time | :25 | – | – | – |
| 20. Petition for Attorneys' Fees | | | | |
| a. Memorandum | – | – | 19.5 | – |
| b. Preparation of Supporting affidavits | 7 | 5:30 | 5.1 | 2.0 |
| 21. Motion to Extend Time | – | :15 | – | – |
| 22. Plaintiffs' Response to Defendants Proposal | – | – | 14.10 (includes .35 conference with co-counsel) | – |